# FILED

MAR 0 3 2003

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN DANIELS, et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Civil Action |
| | ) No. 03C — 1550 |
| WAYNE BURSEY, et al., | ) |
| | ) |
| Defendants. | ) |

**NOTICE OF REMOVAL**

NOW come defendants WAYNE BURSEY, DANIEL CARPENTER,

STEP PLAN SERVICES, INC., BENISTAR ADMIN SERVICES, INC., and

BENISTAR INSURANCE GROUP, INC. (collectively, the "BENISTAR

Defendants"), upon information and belief, and respectfully represent to

the Court as follows:

DOCKETED

MAR 0 4 2003

I.

On February 14, 2003, plaintiffs filed an action in the Circuit Court

of Cook County, Illinois, Law Division (the "State Court"), bearing Civil

Action No. 03-L-001917.

II.

The basis for removal is federal question jurisdiction pursuant to 28

U.S.C. § 1331 and the Employee Retirement Income Security Act of 1974,

as amended ("ERISA"), 29 U.S.C. § 1132(e)(1). Pursuant to ERISA, this

Court has original and exclusive subject matter jurisdiction over this action.

### III.

Removal of this action is proper pursuant to 28 U.S.C. § 1441 since it is a civil action brought in a state court and the federal courts have original and exclusive jurisdiction of the subject matter pursuant to 28 U.S.C. § 1332 and 29 U.S.C. § 1132(e)(1).

### IV.

Wherefore, the BENISTAR Defendants, pursuant to the statutes and in conformance with the requirements set forth in 28 U.S.C. § 1441, pray that the Court remove this action for trial from the State Court to this Court.

### V.

This Notice of Removal is timely filed with this Court pursuant to 28 U.S.C. § 1446(b) and Fed.R.Civ.P. 81(c).

### VI.

The venue of this removed action is proper pursuant to 28 U.S.C. § 1441(a) since the United States District Court for the Northern District of Illinois, Eastern Division, embraces the State Court, which is the place where this action has been pending.

### VII.

The BENISTAR Defendants reserve the right to raise all defenses and objections in this action after this action is removed to this Court.

VIII.

Concurrent with the filing of this Notice of Removal, the BENISTAR Defendants shall give written notice to the attorneys for the plaintiffs and the other defendants, shall file a copy of this Notice of Removal with the Clerk of the State Court, and herewith give proof of such notice of filing to this Court.

**WHEREFORE**, **PREMISES CONSIDERED**, the BENISTAR Defendants pray that this Court assume jurisdiction over this action and retain it for final disposition.

Dated: March 1, 2003

Respectfully submitted,

WAYNE BURSEY, DANIEL CARPENTER, STEP PLAN SERVICES, INC., BENISTAR ADMIN SERVICES, INC., and BENISTAR INSURANCE GROUP, INC.,

By their attorney,

Jack E. Robinson, Esq.
2187 Atlantic Street
Stamford, CT 06902
(203) 969-6000

*Admission Pro Hac Vice Pending*

3

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of this Notice of Removal was served via Federal Express overnight delivery on the clerk of the State Court and plaintiffs' counsel, and by first class mail, postage prepaid, on the other defendants in this action.

Jack E. Robinson, Esq.

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

## COUNTY DEPARTMENT, ~~CHANCERY~~ LAW DIVISION

|  |  |
|---|---|
| JOHN DANIELS, MANUEL SANCHEZ, TIMOTHY HOFFMAN, DIANE HUNTLEY, JOSEPH BONACCORSI, MARY OBRZUT, EDWARD ORDONEZ, individually and on behalf of SANCHEZ & DANIELS STEP PLAN and on behalf of SANCHEZ & DANIELS STEP PLAN PARTICIPANTS and similarly situated individuals 333 W. Wacker Drive, Suite 500 Chicago, IL 60606 | CIVIL ACTION NO. |

SANCHEZ & DANIELS
333 W. Wacker Drive, Suite 500
Chicago, IL 60606

                              Plaintiffs,

            v.

WAYNE BURSEY
100 Grist Mill Road
Simsbury, CT 06070

DANIEL CARPENTER
100 Grist Mill Road
Simsbury, CT 06070

STEP PLAN SERVICES, INC.
100 Grist Mill Road
Simsbury, CT 06070

BENISTAR ADMIN SERVICES, INC.
507 Hopmeadow Street
Simsbury, CT 06070

BENISTAR INSURANCE GROUP, INC.
a/k/a BENISTAR
100 Grist Mill Road
Simsbury, CT 06070

MELLON TRUST OF NEW YORK
1735 Market Street

JURY DEMANDED

Philadelphia, PA 19103                                    :

TEPLITZKY & COMPANY P.C.                                  :
One Bradley Road Bldg. 600                                :
Woodbridge, CT 06525                                      :

PRUDENTIAL INSURANCE COMPANY                              :
OF AMERICA                                                :
745 Broad Street                                          :
Newark, NJ 07101                                          :

THOMAS J. MURPHY, individually and                        :
as an agent of                                            :

CLU & ASSOCIATES                                          :
1110 Jorie Blvd, Suite 202                                :
OAK BROOK, IL 60523                                       :

BRUCE LEVY                                                :
1901 Market Street, 32nd Floor                            :
Philadelphia, PA 19103                                    :

METLIFE, INC.                                             :
1 Madison Ave.                                            :
New York, NY 10010                                        :

NATIONAL LIFE INSURANCE COMPANY                           :
1 National Life Drive                                     :
Montpelier, VT 05604                                      :

HARTFORD LIFE INSURANCE COMPANY                           :
Hartford Plaza                                            :
Hartford, CT 06115                                        :

ALLMERICA FINANCIAL BENEFIT                               :
INSURANCE COMPANY                                         :
645 West Grand Driver Road                                :
Howell, MI 48843                                          :

NEW YORK LIFE INSURANCE COMPANY                           :
51 Madison Avenue                                         :
New York, NY 10010                                        :

                              Defendants                  :

# COMPLAINT

Plaintiffs, JOHN DANIELS ("DANIELS"), MANUEL SANCHEZ ("SANCHEZ"), TIMOTHY

V. HOFFMAN ("HOFFMAN"), DIANE C. HUNTLEY ("HUNTLEY"), JOSEPH P.

BONACCORSI ("BONACCORSI"), MARY OBRZUT ("OBRZUT"), and EDWARD

ORDONEZ ("ORDONEZ"), individually on and on behalf of SANCHEZ & DANIELS

("S&D"), SANCHEZ & DANIELS STEP PLAN ("S&D STEP PLAN") and SANCHEZ &

DANIELS STEP PLAN PARTICIPANTS ("S&D PLAN PARTICIPANTS") by their

undersigned counsel, allege as their Complaint against Defendants, WAYNE BURSEY

("BURSEY"), DANIEL CARPENTER ("CARPENTER"), STEP PLAN SERVICES, INC.

("STEP PLAN SERVICES"), BENISTAR ADMIN SERVICES, INC. ("BENISTAR ADMIN"),

BENISTAR INSURANCE GROUP, INC. a/k/a BENISTAR ("BENISTAR"), MELLON

TRUST OF NEW YORK ("MELLON"), TEPLITZKY & COMPANY, P.C. ("TEPLITZKY"),

PRUDENTIAL INSURANCE COMPANY OF AMERICA ("PRUDENTIAL"), THOMAS

MURPHY ("MURPHY"), CLU & ASSOCIATES ("CLU"), BRUCE LEVY ("LEVY"),

METLIFE, INC. ("METLIFE"), NATIONAL LIFE INSURANCE COMPANY ("NATIONAL

LIFE"), HARTFORD LIFE INSURANCE COMPANY ("HARTFORD"), ALLMERICA

FINANCIAL BENEFIT INSURANCE COMPANY("ALLMERICA"), NEW YORK LIFE

INSURANCE COMPANY ("NEW YORK LIFE"), (collectively, "Defendants"), as follows:

PHIDOCS-32422.1

-3-

## Preliminary Statement

1.      The lawsuit concerns the SANCHEZ & DANIELS STEP PLAN (the "S&D STEP PLAN"), a welfare benefit Plan established by S&D as a benefit for its employees, and other similarly created STEP Plans ("STEP PLAN(S)") established by other employers for the benefit of their employees.

2.      The individual Plaintiffs are Plan Participants in the S&D STEP PLAN. Plaintiff S&D is an employer sponsor, and a fiduciary of the S&D STEP PLAN.

3.      On its 1999 Form 5500 filed with the IRS, TEPLITZKY disclosed that approximately 255 employers around the U.S. had adopted the STEP PLANS and TEPLITZKY listed insurance cash surrender value of over $47,000,000 contained in life insurance policies covering 857 Participants.

4.      Plaintiffs, including the Class, claim that they were fraudulently induced by certain Defendants, including TEPLITZKY, LEVY, PRUDENTIAL, and MURPHY, with false promises to participate in an alleged multiple welfare benefit Plan that was in actuality an unlicensed insurance company. The inducement was in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. These losses have yet to be calculated, and depend on a variety factors, but will likely exceed $1.0 million and could possibly exceed $100 million.

5.      Further Plaintiffs claim that certain Defendants, TEPLITZKY, MELLON, BENISTAR, BENISTAR ADMIN, and STEP SERVICES, participated or assisted in breaches of fiduciary duty, including self-dealing and conversion of Plan assets. These losses have yet to be calculated, and depend on a variety factors, but will likely exceed $1.0 million and could possibly exceed $100 million.

6.     Further the Plaintiffs claim that certain Defendants, MELLON, BENISTAR, STEP SERVICES, BENISTAR ADMIN, CARPENTER, and BURSEY, were and/or are Fiduciaries or owe non-fiduciary duties to the S&D STEP PLAN and other STEP PLANS. Further, Plaintiffs claim that Defendants breached fiduciary duties to each STEP PLAN participant in violation of the common law and ERISA § 409 (29 U.S.C. § 1109) in a variety of ways. And Plaintiffs claim that the Defendants are obliged, under ERISA and state common law, to make good to the Plan the loss it has suffered as a result of their fiduciary breaches. These losses have yet to be calculated, and depend on a variety factors, but will likely exceed $1.0 million and could possibly exceed $100 million.

7.     Because the claims apply to the Participants and beneficiaries as a whole, and because ERISA and common law authorizes Participants such as S&D STEP PLAN Participants to sue for Plan-wide relief for breaches of fiduciary duty, they seek to bring this action on behalf of themselves and the class of all the Participants and Beneficiaries of the STEP PLANS during the relevant period.

## NATURE OF THE APPLICATION FOR PRELIMINARY INJUNCTION

8.     Among the claims asserted in this action is that BENISTAR, BENISTAR ADMIN, STEP SERVICES, and various individual corporate officers, all have an irreconcilable conflict of interest in continuing to serve as Fiduciaries and/or contractors of the STEP PLANS.

9.     It has become clear that actions that critically affect the interests of the Plan Participants are being taken by these same Defendant Fiduciaries notwithstanding their continuing breach of fiduciary duty.

10.    BENISTAR, STEP SERVICES, BURSEY, and CARPENTER are currently in the process of churning policies and looting Plan assets in a scheme to terminate employer STEP

PLANS.

11. BENISTAR, STEP SERVICES, BURSEY, AND CARPENTER attempted to coerce S&D and similarly situated employer sponsors to accept the dissipation of 20% of assets for employees, or suffer a 10% reduction and agree to transfer those assets to the BENISTAR 419 Plan, or suffer other adverse consequences.

12. BENISTAR, STEP SERVICES, BURSEY, AND CARPENTER did not use reasonable means to make such assessments, and rather, BENISTAR and STEP SERVICES constructed these assessments with the intention of coercing employers to adopt the BENISTAR 419 Plan, a benefit Plan administered and sponsored by corporate affiliates of BENISTAR and/or STEP SERVICES.

13. BENISTAR, STEP SERVICES, BURSEY, and CARPENTER knew that they would derive additional insurance commissions, administration fees and other revenue and thus created an economic detriment for those employers who did not elect these options.

14. BENISTAR, STEP SERVICES, BURSEY, and CARPENTER knew or should have known that these options deviated in material respect from the STEP PLAN and Trust documents which these defendants were purported operating the Plan pursuant to. A true and correct copy of the Plan Documents and Trust Documents is attached hereto as Exhibit "A".

15. At no time did BENISTAR, STEP SERVICES, BURSEY or CARPENTER offer to co-operate with employers in any other fashion, although other alternatives were available; and such failure to co-operate occurred because BENISTAR, STEP SERVICES, BURSEY, and/or CARPENTER could not personally profit from offering other alternatives.

16. These actions by BENISTAR, STEP SERVICES, BURSEY and CARPENTER are breaches of fiduciary duty.

PHIDOCS-32422.1

17.    Because Defendants' BENISTAR, STEP SERVICES, BURSEY, and CARPENTER, conduct with respect to these issues may seriously jeopardize the interests of the Participants in the immediate future, Plaintiffs request for themselves and the Class an immediate preliminary injunction prohibiting BENISTAR, BENISTAR ADMIN, STEP SERVICES, BURSEY, AND CARPENTER, from terminating the employer STEP PLANS and dissipating further assets.

18.    As it is essential that the STEP PLANS have a decision maker on these, and other issues that may arise given the nature of the employee Plans, the Court should appoint a neutral fiduciary to manage the individual employer STEP Plan or allow each employer to personally choose a fiduciary to manage the individual employers STEP Plan.

### Parties

19.    Plaintiff SANCHEZ & DANIELS ("S&D") is an Illinois general partnership involved in the practice of law with a place of business in Chicago, Illinois, at the address set forth in the caption above.

20.    Plaintiff JOHN DANIELS ("DANIELS") is a general partner of S&D with a place of business in Chicago, Illinois, at the address set forth in the caption above. DANIELS is a participant of the S&D STEP PLAN.

21.    Plaintiff MANUEL SANCHEZ ("SANCHEZ") is a general partner of S&D with a place of business in Chicago, Illinois, at the address set forth in the caption above. SANCHEZ is a participant of the S&D STEP PLAN.

22.    Plaintiff TIMOTHY HOFFMAN ("HOFFMAN") is a general partner of S&D with a place of business in Chicago, Illinois, at the address set forth in the caption above. HOFFMAN is a participant of the S&D STEP PLAN.

23.    Plaintiff DIANE HUNTLEY ("HUNTLEY") is an employee of S&D with a place of business in Chicago, Illinois, at the address set forth in the caption above. HUNTLEY is a participant of the S&D STEP PLAN.

24.    Plaintiff JOSEPH BONACCORSI ("BONACCORSI ") was a general partner of S&D with a place of business in Chicago, Illinois, at the address set forth in the caption above. BONACCORSI is a participant of the S&D STEP PLAN.

25.    Plaintiff MARY OBRZUT ("OBRZUT") is an employee of S&D with a place of business in Chicago, Illinois, at the address set forth in the caption above. OBRZUT is a participant of the S&D STEP PLAN.

26.    Plaintiff EDWARD ORDONEZ ("ORDONEZ") is an employee of S&D with a place of business in Chicago, Illinois, at the address set forth in the caption above. ORDONEZ is a participant of the S&D STEP PLAN.

27.    Defendant STEP PLAN SERVICES, INC. ("STEP SERVICES") is a Connecticut corporation with a principal place of business at the address set forth in the caption above. STEP SERVICES is an agent and/or affiliate of BENISTAR INSURANCE GROUP, INC. ("BENISTAR INSURANCE") a/k/a BENISTAR ("BENISTAR").

28.    Defendant BENISTAR ADMIN SERVICES, INC. ("BENISTAR ADMIN"), is a Delaware Corporation with a principal place of business at the address set forth in the caption above. BENISTAR ADMIN is an agent and/or affiliate of BENISTAR and STEP SERVICES.

29.    Defendant BENISTAR INSURANCE GROUP, INC. ("BENISTAR INSURANCE") a/k/a BENISTAR ("BENISTAR") is a Delaware corporation with a principal place of business at the address set forth in the caption above.

30.    Upon information and belief, Defendant DANIEL CARPENTER

CARPENTER") is a Connecticut citizen and a principal of BENISTAR, BENISTAR ADMIN d STEP SERVICES.

31.    Upon information and belief, Defendant WAYNE BURSEY ("BURSEY") is a Connecticut citizen and a principal of BENISTAR and STEP SERVICES.

32.    Upon information and belief, PRUDENTIAL INSURANCE COMPANY ("PRUDENTIAL"), with a principal place of business at the address listed above, is an insurance company licensed to do business in the State of Illinois.

33.    Upon information and belief, METLIFE, INC. ("METLIFE"), with a principal place of business at the address listed above, is an insurance company licensed to do business in the State of Illinois.

34.    Upon information and belief, NEW YORK LIFE INSURANCE COMPANY ("NEW YORK LIFE"), with a principal place of business at the address listed above, is an insurance company licensed to do business in the State of Illinois.

35.    Upon information and belief, ALLMERICA FINANCIAL BENEFIT INSURANCE COMPANY ("ALLMERICA"), with a principal place of business at the address listed above, is an insurance company licensed to do business in the State of Illinois.

36.    Upon information and belief, HARTFORD LIFE INSURANCE COMPANY ("HARTFORD"), with a principal place of business at the address listed above, is an insurance company licensed to do business in the State of Illinois.

37.    Upon information and belief, NATIONAL LIFE INSURANCE COMPANY ("NATIONAL LIFE"), with a principal place of business at the address listed above, is an insurance company licensed to do business in the State of Illinois.

38.    Upon information and belief, CLU & ASSOCIATES ("CLU") with a principal

e of business at the address listed above was at all relevant times an Illinois Insurance

ncy licensed to do business in the State of Illinois.

39.     Upon information and belief, Defendant THOMAS MURHY ("MURPHY"), with

incipal place of business at the address listed above, was at all relevant times, an agent of

U and PRUDENTIAL.

40.     STEP SERVICES, BENISTAR ADMIN and BENISTAR, at all relevant times,

e doing business within the State of Illinois.

41.     PRUDENTIAL, METLIFE, NEW YORK LIFE, ALLMERICA, HARTFORD

d NATIONAL LIFE, at all relevant times, were doing business within the State of Illinois as

insurance company providing insurance and insurance services to S&D and employers like

&D.

## Jurisdiction and Venue

42.     This Court has subject matter jurisdiction over the claims presented in this action.

43.     This Court has personal jurisdiction over the Defendants, all of whom are

sidents of the United States and certain of whom are residents of Illinois, as Defendants have

ansacted business in Cook County, Illinois and committed tortuous acts within Cook County,

linois that have caused significant injury to residents of Cook County, Illinois.

44.     Venue is proper pursuant to 735 ILCS 5/2-101 in that: 1) the transaction at issue

r some part thereof occurred in Cook County, Illinois; 2) the S&D STEP PLAN was originally

ontracted for in Cook County; 3) some or all of the fiduciary breaches for which relief is sought

ccurred in this Cook County; 4) injury occurred in Cook County; 5) the original employee

enefit Plan was solicited in Cook County; and 6) S&D's primary place of business is in Cook

ounty.

NO.981    P012

## APPROPRIATENESS OF CLASS ACTION

45.    Plaintiffs bring this action on behalf of themselves and a class (the "Class") of all persons similarly situated. The Class itself consists of all persons who were employee sponsors, Participants in or beneficiaries of the Plan, at any time from January 1, 1995, to the present (the "Class Period") and who made or maintained participation in the STEP Plans.

46.    Plaintiffs meet the prerequisites to bring this action on behalf of the Class because:

**Numerosity.** The Class consists of over 200 employers and 1,000 individuals and is so numerous that joinder of all members as individual plaintiffs is impracticable.

**Appropriateness.** The Class action devise is appropriate to adjudicate these multiple claims.

**Commonality.** There are questions of law and fact common to the Class.

**Typicality.** Plaintiffs' claims are typical of the claims of the class.

**Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class. They have no interests that are antagonistic to or in conflict with the interest of the Class as a whole, and they have engaged competent counsel, experienced in ERISA welfare benefit actions and insurance actions, as well as in other class and complex litigation, to ensure protection of the interests of the Class as a whole.

**Predominance.** Common issues predominate over individual issues.

47.    This action is maintainable as a class action for the following four independent reasons:

a. The prosecution of separate actions by the members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual members of the Class, which would establish incompatible standards of conduct for Defendants.

The prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

The Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

Questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

The Class action device is appropriate to adjudicate these multiple claims.

## FIDUCIARY STATUS OF CERTAIN DEFENDANTS

48.    During the Class Period, Defendants CARPENTER, BURSEY, STEP SERVICES, BENISTAR, BENISTAR ADMIN, MELLON, and TEPLITZKY, (collectively "FIDUCIARY DEFENDANTS") had discretionary authority respecting management of the S&D STEP PLAN and other employer STEP PLANS (collectively "STEP PLANS") and/or the management or disposition of the these plans assets and had discretionary authority or responsibility for the administration of the plans.

49.    During the Class Period, all of the FIDUCIARY DEFENDANTS acted as fiduciaries of the STEP PLANS and the S&D STEP PLAN pursuant to the common law and/or ERISA § 3(21)(A) (29 U.S.C. § 1002(21)(A)) and the law interpreting that section.

50.    ERISA requires every Plan to provide for one or more named Fiduciaries, who will have "authority to control and manage the operation and administration of the Plan." ERISA

PHIDOCS-32422.1                            -12-

02(a)(1) (29 U.S.C. § 1102(a)(1)).

51.    During the Class Period, under the original adoption agreements signed by S&D, PLITZKY, and MELLON were designated as named Fiduciaries under the S&D STEP PLAN i upon information and belief all STEP PLANS.

52.    ERISA treats as Fiduciaries not only persons explicitly named as Fiduciaries der § 402(a)(1), but also persons who act as Fiduciaries.  ERISA § 3(21)(A)(i) (29 U.S.C. § 02 (21)(A)(i)) makes a person (including a juridical person such as BENISTAR) a fiduciary o the extent he exercises any discretionary authority or discretionary control respecting anagement of such Plan or exercises any authority or control respecting management or isposition of its assets ...."  Under this standard, a person who appoints a fiduciary has a iduciary responsibility to monitor the person appointed.

53.    Upon the constructive termination of the STEP PLANS, employers such as S&D ere Fiduciaries.

54.    STEP SERVICES is a holder of Plan assets, and its affiliates are Plan Fiduciaries ecause they control those assets.

55.    In addition, under ERISA, in various circumstances non-Fiduciaries who nowingly participate in fiduciary breaches may themselves be liable.  To the extent any of the IDUCIARY DEFENDANTS are not Fiduciaries, they remain liable as non-Fiduciaries who nowingly participated in the fiduciary breaches described below.

## SEVERANCE TRUST EXECUTIVE PROGRAM PLANS

56.    STEP ("SEVERANCE TRUST EXECUTIVE PROGRAM") PLANS were conceived by U.S. Trust Co. ("US Trust") and other persons, including PRUDENTIAL and LEVY, in the early 1990s as a vehicle for employers to allegedly purchase life insurance on a tax

deductible basis. (Marketing Materials Ex. "B").

57.    The STEP PLANS purported to be a welfare benefit Plan described in section 419A(f)(6) of the Internal Revenue Code ("IRC"). *Id.*

58.    The STEP PLANS were designed to provide Participants with death benefits and severance benefits. *Id.*

59.    Under the applicable provisions of ERISA and the IRC, severance benefits can be welfare benefits, if they are not directly or indirectly retirement benefits.

60.    The promoters of the STEP PLANS designed the benefits in such a way that they would primarily benefit highly-compensated owner-employees.

61.    The promoters also designed "severance events" that appeared to be "involuntary," but in fact were in most cases subject to direct or indirect control by the Plan Participants. *Id.*

62.    The benefits of each STEP Plan were marketed by LEVY, PRUDENTIAL, MURPHY, and others as a substitute for nonqualified deferred compensation. *Id.*

63.    Under prevailing case law, Treasury Regulations, and Labor Regulations, a nonqualified deferred compensation benefit is not presently deductible. A severance benefit that is directly or indirectly payable on retirement is not a welfare benefit. It is clear that a Plan that could have the same effect of deferred compensation, but be currently deductible, would be attractive to employers if the Plan were properly constructed.

64.    Tax deductibility was the big marketing point for each STEP Plan. *Id.*

65.    Each STEP Plan was marketed as a tax shelter for highly compensated employees.

66.    While disguised as a welfare Plan, insurance agents routinely sold the individual

TEP Plan with a wink and a nod telling a much different scenario. The promoters knew that
ghly compensated employees, who controlled the businesses that bought into each STEP Plan,
uld pretty much control severance events. That set-up would invalidate the welfare benefit
ature of the Plan and destroy the current deduction taken by any sponsoring employer if the IRS
ver found out.

67.     STEP PLANS were attractive and extremely profitable to the participating
insurance companies. PRUDENTIAL, METLIFE, NEW YORK LIFE, ALLMERICA,
HARTFORD, and NATIONAL LIFE (collectively "INSURANCE COMPANIES"), because the
promoters designed STEP to invest in life insurance policies to fund the severance and death
enefits. *Id.*

68.     While telling the IRS that each STEP Plan was a welfare Plan, the promoters,
cluding LEVY and the INSURANCE COMPANIES (collectively "PROMOTERS"), fed the
urchasers of the insurance products the story that the STEP PLAN concept was "legitimate" and
hat the amounts were fully "deductible."

69.     The PROMOTERS and insurance agents representing the INSURANCE
COMPANIES presented tax opinion letters from a large New York law firm and an actuarial
opinion from none less than Price Waterhouse's CPAs. (Opinions, Ex. "C").

70.     Employers adopted their STEP Plan by executing Plan Adoption Agreements and
then forwarding sizable Plan "contributions." (Adoption Agreement, EX. "D").

71.     After selecting a benefit with the help of insurance agents of the INSURANCE
COMPANIES, the employer who adopted the Plan would then arrange for select employees to
execute applications for permanent life insurance.

72.     On its 1998 Form 5500 filed with the IRS, STEP Inc. disclosed that 255

PHIDOCS-32422.1                    -15-

02/05/2003 12:29    NO.981    □017

employers were in the Plans. (IRS Form 5550, Ex. "E"). Insurance cash surrender value was over $36,000,000 and cash totaled over $3.5 million. *Id.* Insurance agents earned $1.094 million in commissions that year. *Id.* Professional fees assessed against the Plan in that year were an astounding $1,778,839, or approximately 15% of the $12 million in Plan contributions. *Id.*

73.    On its 1999 Form 5500 filed with the IRS, STEP, Inc. disclosed that approximately 255 employers around the U.S. had adopted the Plans. (IRS Form 5550, Ex. "F"). STEP, Inc. listed insurance cash surrender value of over $47,000,000 contained in life insurance policies covering 857 Participants. *Id.* STEP, Inc. also listed over $3 million of cash available for benefits. *Id.* While the death benefits offered by STEP, Inc. were insured, it appears STEP, Inc. was also relying on cash and cash surrender values for its severance benefits. *Id.*

74.    At no time did, the FIDUCIARY DEFENDANTS, the PROMOTERS, or the INSURANCE COMPANIES warn any employer that the STEP Plan concept was a multiple employer welfare arrangement ("MEWA") as described in ERISA section 514, and that as such, it was potentially subject to regulation as an insurance company by States if benefits were not fully-insured.

75.    US Trust was the original Plan Sponsor and Trustee of STEP.

76.    PRUDENTIAL was actively marketing STEP Plans throughout its agent base and was listed on the adoption agreement and other prominent STEP documents.

77.    In various conversations in 1995, MURPHY told S&D that S&D could always get their money from the S&D STEP PLAN.

78.    MURPHY and PRUDENTIAL knew or should have known that there would have to be a deviation from the plan documents for the this easy withdrawal to happen.

79.    MURPHY and PRUDENTIAL actively marketed the easy withdrawal from the

TEP Plans.

80. In 1997, MELLON assumed the role of Trustee of the STEP PLANS.

81. The Trust administration occurred on the premises of MELLON at 1735 Market, Philadelphia, PA 19103.

82. Sometime in 1997, STEP, Inc., a corporation with an address at 225 Oser Ave., Hauppage, NY 11788, became the new Plan Sponsor.[1] (Ex. "D").

83. It appears that sometime after 1996, US Trust resigned. At no time, however, were employers given the chance to vote on the selection of the successor Plan Sponsor when US Trust resigned.

84. Sec. 8.6(a) of the original STEP PLAN Document required a 60 day written notice to the employers if a Plan Sponsor wished to resign. Section 8.6(b) required a 70% vote of employers to confirm a suitable successor Plan Sponsor ("70% vote").

85. S&D received no notice of US Trust resigning, and did not have the opportunity to vote on STEP, Inc.

86. Upon information and belief, US Trust, TEPLITZKY, and other parties, conspired to unilaterally change the Plan Document without notice to the employer sponsors.

87. In furtherance of their own interests, US Trust, TEPLITZKY and other parties changed the fundamental intent of the STEP PLAN Document, in direct contradiction to the STEP PLAN'S purposes and preamble, by deleting the Sec. 8.6 requirements.

88. The deletion of the 70% vote was a material change to the STEP PLAN Documents.

89. The deletion of the 70% vote was a change implemented in the own self-interest

---

[1] It is not currently know what connection, if any, Step, Inc. has with BENISTAR, and/or principals of BENISTAR.

and for the gain of TEPLITZKY and other individuals.

90. The deletion of the 70% vote was against the best interest of the STEP PLAN employer sponsors, beneficiaries, and Participants.

91. It appears, therefore, that STEP, Inc., and/or STEP SERVICES were never validly confirmed as sponsor.[2]

92. The material change in the 70% requirement turned the PLAN from a possible MEWA to a trust under only the control of TEPLITZKY and STEP, Inc.

93. Upon information and belief, BENISTAR became affiliated with the STEP PLANS at the behest and action of TEPLITZKY.

94. Upon information and belief, BENISTAR, STEP SERVICES, and/or its affiliates paid TEPLITZKY a substantial sum to take over administration of the STEP PLANS.

95. Upon information and belief, BENISTAR, STEP SERVICES, BENISTAR ADMIN, BURSEY, and CARPENTER became Administrator of the STEP PLANS with the intention of looting the STEP PLANS' assets directly or indirectly by creating a mandatory termination event for all STEP PLAN employers.

96. BENISTAR and/or its affiliates are is also in the business of operating a purported section 419A(f)(6) arrangement funded with life insurance policies ("BENISTAR 419 Plan").

97. BENISTAR and/or its affiliates and/or its principals, including CARPENTER and BURSEY, directly or indirectly receive insurance commissions when insurance policies are placed in the BENISTAR 419 Plan.

98. Upon information and belief, BENISTAR, STEP SERVICES, BENISTAR ADMIN, CARPENTER, and BURSEY are on notice that the BENISTAR 419 Plan does not

comply with section 419A(f)(6) under said Proposed Regulations, or under Private Letter Ruling 200127047.

99.     Moreover, upon information and belief, BENISTAR, STEP SERVICES, BENISTAR ADMIN, and CARPENTER were on notice that under the Tax Court decisions of *Grant-Jacoby, Inc. v. Commissioner*, 73 T.C. 700 (1980) and *Neonatology Assoc., P.C. v. Commissioner*, 115 T.C. 43 (2000), *aff'd*, 293 F.3d 128 (3d Cir. 2002), the BENISTAR 419 Plan is not a welfare benefit Plan for tax purposes because it is designed to discriminate against participation of non-owner employees and serves no valid welfare purpose.

100.    In 2001, S&D contacted the S&D STEP PLAN Administrator, TEPLITZKY, about a withdrawal or freeze of contributions. Shortly after that time, a new entity came on the scene: STEP SERVICES and BENISTAR ADMIN, affiliates of BENISTAR. (Ex. "G").

101.    BENISTAR, BENISTAR ADMIN, and STEP SERVICES are controlled by CARPENTER and BURSEY.

102.    On February 19, 2002, BURSEY on behalf of BENISTAR, BENISTAR ADMIN, and STEP SERVICES contacted S&D by letter. (Ex. "G" and "H").

103.    BURSEY disclosed that the "BENISTAR family" was the new STEP Plan Administrator. *Id.*

104.    BENISTAR and STEP SERVICES offered to borrow money from the STEP policies (on the lives of Participants) and deposit them into a new section 419A(f)(6) Plan administered and controlled by their corporate affiliates ("BENISTAR 419 Plan"). *Id.*

105.    On June 20, 2002, BURSEY stated that BENISTAR and STEP SERVICES would impose a termination assessment of 20% and pay only 80% of the calculated benefit if employers

---

[2]     In accordance with the Plan Documents, the Plan should have been terminated at this point.

not take its offer to "rollover" to the new BENISTAR 419 Plan. If employers chose to over to the BENISTAR 419 Plan, an assessment of 10% would be charged. No reason for the ference in percentages was given. *Id.*

106.    BENISTAR and STEP SERVICES were purportedly going to unilaterally reduce verance benefits to cover an unspecified "Plan deficit." Such an action constitutes prohibited perience rating under the holding of *Booth v. Commissioner*, 108 T.C. 524 (1997).

107.    In connection with their scheme, BENISTAR, BENISTAR ADMIN, STEP ERVICES, BURSEY, and CARPENTER anticipated that they would be able to divert to their n use a substantial amount of each STEP PLAN'S assets by demanding 20% or 10% of the sets attributable to each employer's participation.

108.    BENISTAR, BENISTAR ADMIN, STEP SERVICES, BURSEY, and ARPENTER plotted that by offering employers a way to get at money otherwise held in the TEP PLANS, the employers would give up 10 or 20 percent of cash values.

109.    If employers took the least costly option, rollover to the BENISTAR 419 Plan, URSEY, CARPENTER, STEP SERVICES, BENISTAR ADMIN and/or BENISTAR would enerate directly or indirectly insurance commissions on the churning of policies to the BENISTAR 419 Plan. Future administration and other fees with respect to the BENISTAR 419 lan would also be generated. Out of the $40,000,000 of cash and cash value, under the scheme URSEY, CARPENTER, STEP SERVICES, and BENISTAR sought to divert between 4,000,000 [10%] and $8,000,000 [20%] away from the STEP PLANS Participants.

110.    In addition, upon information and belief, BENISTAR, BURSEY, CARPENTER nd/or their corporate affiliates arranged "guaranteed issue insurance" arrangements with an nnamed insurance company. If successful, BENISTAR, BURSEY, CARPENTER and/or their

porate affiliates would earn commissions and/or other compensation on at least $30,000,000 new insurance premiums.

111.    Even at a 5% commission, the BENISTAR "affiliates," "Fiduciaries" and/or ents appeared poised to earn at least $1,500,000 in new insurance commissions from the STEP AN assets.

112.    TEPLITZKY and the other STEP PLAN Fiduciaries failed to exercise proper luciary duty on behalf of the STEP PLANS Participants, and failed to investigate the true otives of BENISTAR, STEP SERVICES, BENISTAR ADMIN, BURSEY, and CARPENTER, ecause they were either receiving compensation, because they were negligent.

113.    During the class period, PRUDENTIAL, METLIFE, and other insurance carriers ffered and paid to TEPLITSKY, STEP SERVICES, MELLON, BENISTAR, and/or other STEP LANS Fiduciaries demutualization proceeds on policies held by or on behalf of the STEP LAN trusts.

114.    The demutualization proceeds were STEP PLANS assets.

115.    Upon information and belief, the demutualization proceeds were not credited to e STEP PLANS.

116.    Upon information and belief, TEPLITZKY, BENISTAR, STEP SERVICES, BENISTAR ADMIN, CARPENTER and/or BURSEY misappropriated the demutualization rocess.

### The IRS Attacked the STEP Plan

117.    On or before March 31, 1997, the Internal Revenue Service ("IRS") audited the tax return of Coastal Neurological Surgery Medical Group ("Coastal"), a California corporation.

118.    Prior to the audit, Coastal was an employer whose employees participated in a

STEP PLAN.

119.   In the years 1992 through 1998, Coastal took federal tax deductions for contributions to a STEP PLAN, relying on the representation of the PROMOTERS that it was a Plan described in section 419A(f)(6) was not a Plan described in Section 419A(f)(6) and disallowed all deductions taken by Coastal.

120.   On March 31, 1997, Coastal filed a petition in the United States Tax Court (Docket No. 6153-97) to contest the determination of the IRS.

121.   In one or more of the years 1997 through 2001, in connection with said Tax Court case, TEPLITZKY, STEP SERVICES and/or BENISTAR provided funds from the assets of the STEP PLANS to fund the Tax Court litigation conducted by Coastal; and counsel and/or the Administrator for the STEP PLANS provided services in connection with said litigation and/or were subpoenaed to testify.

122.   On February 6, 2001, the Honorable David Laro, Judge of the United States Tax Court, accepted the Stipulation[3] of the parties wherein:

(a) approximately 75 percent of the deductions claimed by Coastal were disallowed for the years in question;

(b) the parties stipulated to the assessment of penalties under IRC § 6662(a) and as applicable § 6651(a)(1), in addition to statutory interest; and

(c) the Coastal employees in the Coastal STEP Plan were charged with additional taxable income, penalties and interest.

123.   Under the Stipulation, the parties agreed that the Coastal STEP Plan was not a Plan described in Section 419A(f)(6) of the Internal Revenue Code, and that no deduction would be permitted by Coastal in the future for the amounts disallowed or ultimately paid out of the

oastal STEP Plan.

124. At all relevant times, TEPLITZKY, BENISTAR ADMIN, STEP SERVICES, URSEY, CARPENTER, MELLON and BENISTAR were on notice of the Tax Court litigation, nd intentionally failed to notify employers and employees involved in the STEP program (i) of he IRS claims concerning the STEP PLANS before and after the beginning of the litigation, and ii) the stipulation, the loss of deductions, assessment of penalties and interest suffered by Coastal STEP Plan as a result of the litigation.

125. At all relevant times, the participation of S&D and other employers involved in he STEP PLANS programs were induced by representations made by the Fiduciaries and promoters of the STEP Plan that it was a Plan described in Section 419A(f)(6) of the IRC, that all contributions would be deductible, and that no penalties would be assessed in the event of disallowance of deduction.

126. Notwithstanding the result suffered by Coastal, STEP SERVICES and the PROMOTERS continued to promote and accept contributions from S&D and other employers on account of STEP "benefits."

127. At all relevant times, STEP SERVICES and the STEP PLAN PROMOTERS/FIDUCIARIES knew or should have known that a principal purpose of employers contributing to each STEP Plan was the attainment for themselves of the federal income tax results denied to Coastal.

128. At all relevant times, the PROMOTERS/FIDUCIARIES knew or should have known that a principal purpose of employers contributing to each STEP Plan was the attainment for employees of the federal income tax results denied to Coastal employees.

129. If S&D and, on information and belief, the similarly situated employer sponsors

⁵ A true and correct copy of the stipulation is attached hereto as Exhibit "I".

PHIDOCS-32422.1                    -23-

ad known about the IRS attack and Stipulation involved in Coastal, S&D and, on information
and belief, the similarly situated employer sponsors would have rescinded its participation in
STEP Plan and not stayed in the STEP Plan or become subject to the actions taken by
BENISTAR, STEP SERVICES, BENISTAR ADMIN, CARPENTER and BURSEY.

130.    On July 11, 2002, the IRS issued Proposed Regulations under IRC section
419A(f)(6).  Under said Proposed Regulations, a Plan like a STEP Plan is not described in
section 419A(f)(6).

## THE UNEXPLAINED ASSESSMENTS

131.    BENISTAR and STEP SERVICES attempted to coerce S&D and, on information
and belief, similarly situated employee sponsors to accept the dissipation of 20% of assets for
employees, or suffer a 10% reduction and agree to transfer those assets to the BENISTAR 419
Plan, or suffer other adverse consequences.

132.    BENISTAR, BENISTAR ADMIN and STEP SERVICES did not use reasonable
means to make such assessments, and rather, BENISTAR constructed these assessments with the
intention of coercing employers to adopt the BENISTAR 419 Plan.

133.    Upon information and belief, BENISTAR, BENISTAR ADMIN, STEP
SERVICES, BURSEY and CARPENTER knew that they or their corporate affiliats would
derive additional insurance commissions, administration fees and other revenue by creating an
economic detriment for those employers who did not elect these options.

134.    BENISTAR, STEP SERVICES, BURSEY and CARPENTER knew or should
have known that these options deviated in material respect from the STEP Plan and Trust
documents.

135.    At no time did BENISTAR, STEP SERVICES, BURSEY or CARPENTER offer

co-operate with employers in any other fashion, although other alternatives were available; and such failure to co-operate occurred because BENISTAR, BURSEY, STEP SERVICES, or CARPENTER could not personally profit from offering other alternatives, like the one demanded by S&D.

136.  After receiving the aforesaid notices, S&D informed BENISTAR, STEP SERVICES, BURSEY and CARPENTER that it accepted none of the alternatives offered by BENISTAR.  (Ex. "H").

137.  S&D demanded that the share of STEP PLANS' assets attributable to its employees be transferred to Community Trust Company, as the new Trustee of a welfare Plan S&D intended to establish.  (Ex. "H").

138.  As an apparent punishment for S&D demanding transfer of its Plan assets to another Plan, instead of the BENISTAR 419 Plan, STEP SERVICES initiated litigation against S&D and its attorney John Koresko.

139.  BENISTAR and its affiliates, including CARPENTER and BURSEY, threatened to dissipate the assets attributable to the S&D employees, and to discriminate against S&D employees as of December 2, 2002.  (Ex. "H").

## COUNT I
## BREACHES OF ERISA AND COMMON LAW FIDUCIARY DUTY AGAINST BURSEY, CARPENTER, STEP SERVICES, BENISTAR, BENISTAR ADMIN, MELLON, TEPLITZKY

140.  Plaintiffs reallege and incorporate the above paragraphs as though they were fully set forth herein.

141.  Both common law and ERISA fiduciary duties exist.

142.  ERISA section 404(a)(1)(A) imposes on a Plan fiduciary a duty of loyalty—that is,

a duty to "discharge his duties with respect to a Plan solely in the interest of the Participants and beneficiaries and for the exclusive purpose of providing benefits to Participants and their beneficiaries."

143.    Section 404(a)(l)(B) also imposes on a Plan fiduciary a duty of prudence--that is, a duty to "discharge his duties with respect to a Plan solely in the interest of the Participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

144.    Under the common law and ERISA, a fiduciary is liable not only for his own fiduciary breaches, but also to use reasonable care to prevent his co-Fiduciaries from breaching their fiduciary duties.

145.    A fiduciary who knows of a co-fiduciary's breach is liable unless he makes reasonable efforts to remedy the breach.

146.    Under the common law and ERISA, a Plan fiduciary's duties of loyalty and prudence include a duty to disclose and inform. This duty entails: 1) a negative duty not to misinform; 2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and 3) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

147.    This duty to disclose and inform recognizes the disparity that may exist, and in this case did exist, between the training and knowledge of the Fiduciaries, on the one hand, and the Participants and beneficiaries, on the other.

148.    During the Class Period, the Defendants BURSEY, CARPENTER, STEP SERVICES, BENISTAR, BENISTAR ADMIN, MELLON, and TEPLITZKY breached their

fiduciary duties to disclose and inform with respect to the IRS and Plan.

149. The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a Plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the Fiduciaries themselves or the Plan sponsor.

150. Defendants BURSEY, CARPENTER, STEP SERVICES, BENISTAR, BENISTAR ADMIN, MELLON, and TEPLITZKY breached their duty to avoid conflicts of interest and to promptly resolve them when they occur by engaging in self dealing.

151. A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the Plan documents. While the basic structure of a Plan may be specified, within limits, by the Plan sponsor, the fiduciary may not blindly follow the Plan document if to do so leads to an imprudent result. ERISA § 404(a)(1)(d) (29 U.S.C. § 1104(a)(1)(D)).

152. To the extent that FIDUCIARY DEFENDANTS blindly followed the direction of the Plan documents, they further breached their fiduciary duties.

Diversion of Plan Assets

153. The application of resources and assets of the STEP PLAN on behalf of the tax liability of Coastal and its principal was a rebate to the employer in violation of the STEP PLAN documents.

154. The application of the resources of the STEP PLANS on behalf of the tax liability of Coastal was an illegal diversion of Plan assets for the benefit of a non-participant, was not in the best interest of Plan Participants, was not a proper administrative expense of the STEP Plan and Trust, and therefore violated the STEP Plan documents and section 406 of ERISA.

155. On information and belief, BENISTAR and other Plan Fiduciaries applied assets

-27-

of the STEP PLANS in like manner and similarly breached their fiduciary duties to the STEP

PLANS and their Participants.

Failure to follow Plan documents

156.    In 2001 and 2002, BENISTAR sent various letters to S&D and upon information

and belief to other similarly situated employers regarding the "options" BENISTAR unilaterally

imposed upon them with respect to their continued participation in their STEP Plan.

157.    S&D elected none of the options imposed by BENISTAR, and instead, elected to

terminate participation in the S&D STEP PLAN and to have the assets of the S&D STEP PLAN

transferred to a welfare benefit Plan created by S&D.

158.    S&D made such request in the best interest of Plan Participants, to protect Plan

assets, continue benefits under a different Plan, and to prevent taxation to S&D employees.

159.    BENISTAR and STEP SERVICES refused to follow the directions of S&D,

notwithstanding that such transfers are permitted under the Internal Revenue Code and ERISA,

and such transfers are not prohibited by the Plan.

160.    BENISTAR and STEP SERVICES failed to follow the directives of S&D,

notwithstanding that the Plan Sponsor has the power to group or reorganize the Plan under

section 11.2.

161.    Defendants BURSEY, CARPENTER, STEP SERVICES, BENISTAR,

BENISTAR INSURANCE, MELLON, and TEPLITZKY as Fiduciaries failed to adhere to the

express provisions of the STEP Plan documents.

162.    Defendants BURSEY, CARPENTER, STEP SERVICES, BENISTAR,

BENISTAR INSURANCE, and the other STEP Plan Fiduciaries committed the acts complained

of herein to increase administration fees and divert Plan assets to their own use, and to generate

PHIDOCS-32422.1                    -28-

insurance commissions and other income from the "churning" of STEP Plan assets into the

BENISTAR death benefit Plan.

### Failure to Terminate Plan or Execute Withdrawal in Accordance with Plan Documents

163.    Section 10.4 of the Plan Document provides:

(a) An Employer may withdraw from the Plan at any time . . . . Upon receipt of written notice from an Employer that it has withdrawn from the trust, the Plan Administrator shall identify all of the Withdrawing Employer's Covered Employees.

164.    Section 10.6 of the Plan Document provides:

Upon Employer withdrawal pursuant to Section 10.4 or 10.5, the withdrawing Employer has no obligation to fund the Life Insurance Benefit provided in Article V, and any insurance policy in effect at such time shall be distributed, surrendered or maintained in accordance with Section 5.2(h)

165.    Section 5.2 (h) of the Plan Document provides that a Covered Employee may

purchase a policy owned by the Plan, and further describes a distribution of such policy.

166.    Section 10.6 applies the command of section 11.4, distribution to a policy, to an

employer withdrawal.

167.    Section 11.4 of the Plan Document provides:

(a) The Plan shall terminate upon delivery by the Plan Sponsor to the Trustee of a written and signed notice of termination. Such notice of termination shall be delivered if . . . the Plan fails to satisfy the requirements of Code § 419A(f)(6) . . . or if, due a change in the law one or more of the principal purposes of the Plan, as determined in the exclusive discretion of the Plan Sponsor, can no longer be accomplished.

(b) Upon the Plan's termination . . . the assets will be distributed ratably to each

covered employee.

168.    Section 5.2 of the Plan Document provides: "In the event the Plan is terminated

in accordance with Section 11.4, the Employee's distributive share shall include any insurance

owned by the Trustee . . . . "

169.    On information and belief, Defendants BURSEY, CARPENTER, STEP SERVICES, BENISTAR, BENISTAR ADMIN, MELLON, TEPLITZKY and all previous Plan Fiduciaries have deviated from the plain language of the Plan and permitted Employer Withdrawals from the Plan in a manner different from the Plan Documents.

170.    On information and belief, Defendants BURSEY, CARPENTER, STEP SERVICES, BENISTAR, BENISTAR ADMIN, MELLON, and TEPLITZKY and all previous Plan Fiduciaries have deviated from the plain language and distributed insurance policies and cash value to Covered Employees without the reductions demanded.

171.    Section 8.6 of the original STEP Plan Document provides that the Plan sponsor may resign, and that a new Plan Sponsor shall be appointed upon acceptance of 70% of Employees.

172.    In the event of resignation and failure to appoint a new Plan Sponsor under section 8.6, the Plan Sponsor shall terminate the Plan and distribute pursuant to section 11.4.

173.    On information and belief, US Trust resigned as Plan Sponsor and no successor was appointed by 70% vote of employers.

174.    Any amendment to the 70% provision is invalid.

175.    On information and belief, each STEP Plan has been in a state of mandatory termination under Plan section 8.6 since before BENISTAR, STEP SERVICES, and their affiliates assumed any role in the Plan.

176.    By virtue of the disposition of the Coastal case, a termination event described in Section 11.4 of the Plan Documents occurred prior to the time BENISTAR came to control the STEP PLANS as Plan Administrator.

177.    Defendants BURSEY, CARPENTER, STEP SERVICES, BENISTAR,

BENISTAR ADMIN, MELLON, and TEPLITZKY failed to deliver said notice of termination although the Plan Sponsor knew or should have known that the Plan failed to satisfy the requirements of Code § 419A(f)(6) by virtue of the Coastal case and the issuance of the Proposed Regulations.

178.   Defendants BURSEY, CARPENTER, STEP SERVICES, BENISTAR, BENISTAR ADMIN, MELLON, and TEPLITZKY failed to deliver said notice of termination although the Plan Sponsor knew or should have known that the law had changed and that the principal purpose of the Plan could no longer be accomplished, and thereby arbitrarily and capriciously failed to exercise discretion and fiduciary duty in the best interest of Plan Participants.

179.   Despite having knowledge of a termination event, MELLON, TEPLITZKY and other Fiduciaries permitted BENISTAR and its affiliates STEP SERVICES, BENISTAR ADMIN, CARPENTER, and BURSEY to take control of the STEP Plans, violate the Plan documents, and make illegal assessments in the context of "terminations" and "withdrawals."

180.   Despite having knowledge of multiple termination events, BENISTAR, BENISTAR ADMIN, and STEP SERVICES, failed to notify employers of their rights, and those of employees, and failed to properly exercise fiduciary duty, so that BENISTAR, BENISTAR ADMIN, and STEP SERVICES could continue to take administration fees and improperly surcharge Plan assets for their own ultimate good.

### Failure To Deal With Plan Assets According To Plan Document And Law

181.   Section 8.2(a) of the Plan Document only gives the Plan Administrator control over those matters not specifically allocated otherwise under the terms of the Plan.

182.   Section 5.2(a) and (b) of the Plan Document specifically provides that the Trustee

have full and complete control over any life insurance policy and permanent policy purchased under each STEP Plan.

183.   The Plan Document does not give any control over any insurance policy to BENISTAR, BENISTAR ADMIN, STEP SERVICES, or any other Plan Administrator.

184.   Under section 8.2 "(a) the Plan Administrator is responsible for (i) applying contributions; (b) approving or denying claims; (c) advising Employers of Covered Employees of their rights and options under the Plan; (d) determining Eligibility of Employee to participate in the Plan; and (v) calculation of benefits."

185.   The Plan Documents do not give to BENISTAR, BENISTAR ADMIN, and/or STEP SERVICES any control over calculation or assessment of amounts in the context of a withdrawal or termination from the Plan.

186.   Despite having no authority to do so, upon information and belief, BENISTAR, BENISTAR ADMIN, and/or STEP SERVICES have manipulated STEP Plan insurance policies, calculated termination and withdrawal amounts, and otherwise dealt in the insurance assets of the STEP PLANS for its own exclusive benefit and to the detriment of STEP Participants.

187.   As a result of the aforesaid, BENISTAR, BENISTAR ADMIN, and/or STEP SERVICES have breached its fiduciary duty to the STEP PLANS and the Plan Participants.

Failure to Act in Best Interests of Plan Participants

188.   BENISTAR and STEP SERVICES unilaterally deviated from the terms of each STEP Plan to benefit itself, and demanded that each Plan Employer face either of the following detrimental events:

(a) rollover of STEP Plan assets to the BENISTAR 419 Plan, with a loss of 10% of asset value; or

(b) withdrawal from the STEP Plan, with a loss of 20% of asset value.

189.    On information and belief, BENISTAR in conjunction with STEP SERVICES, obtained no actuarial certification or other justification for charging the 10% or 20% hold-backs aforesaid.

190.    To justify these demands, and as part of its coercion of employers, BENISTAR in conjunction with STEP SERVICES falsely represented the negative effect of the Proposed Regulations under IRC sec. 419A(f)(6), knowing that such Proposed Regulations are not final and may not be valid at all, and failing to disclose that the Proposed Regulations do not themselves compel the termination of any Plan or transfers to the other BENISTAR Plans.

191.    BENISTAR and/or its affiliates are in the business of operating the BENISTAR 419 Plan, a purported section 419A(f)(6) arrangement funded with life insurance policies.

192.    BENISTAR and its principals, including CARPENTER and BURSEY, directly or indirectly receive insurance commissions when insurance policies are placed in the BENISTAR 419 Plan.

193.    Upon information and belief, BENISTAR and CARPENTER are both on notice that the BENISTAR 419 Plan does not comply with section 419A(f)(6) under said Proposed Regulations, or under Private Letter Ruling 200127047.

194.    Moreover, under the Tax Court decisions of *Grant-Jacoby, Inc. v. Commissioner*, 73 T.C. 700 (1980). (1980) and *Neonatology Assoc., PC v. Commissioner*, 115 TC 115 T.C. 43 (2000), *affirmed* (3rd Cir. 2002), the BENISTAR 419 Plan is not a welfare benefit Plan for tax purposes because it is designed to discriminate against participation of non-owner employees and serves no valid welfare purpose.

195.    On information and belief, BENISTAR and STEP SERVICES used the threat of dissipation of each STEP Plan assets to coerce each employer like S&D to adopt the BENISTAR

419 Plan, even though BENISTAR and STEP SERVICES knew or should have known that the amounts threatened to be taken from the STEP PLANS assets were not reasonable or necessary for the payment of benefits from the STEP PLANS.

196.   On information and belief, BENISTAR and STEP SERVICES engaged in such actions to generate insurance commissions and additional implementation and administration fees for itself or its affiliates in connection with roll-overs from the STEP PLANS to the BENISTAR 419 Plan.

197.   On information and belief, BENISTAR in conjunction with STEP SERVICES has assessed many Employers and Employees in the STEP PLANS such "charges" and generated commissions and fees for itself and its affiliates in violation of its fiduciary duty to such Employers and Participants.

198.   On information and belief, by its actions, BENISTAR in conjunction with STEP SERVICES has diverted hundreds of thousands of dollars from the employees participating in the STEP PLANS.  BENISTAR, STEP SERVICES, BENISTAR ADMIN, BURSEY and CARPENTER have wrongfully benefited from transactions in connection with the aforesaid.

199.   On information and belief, BENISTAR, BENISTAR ADMIN, STEP SERVICES, BURSEY and CARPENTER have additionally breached their fiduciary duties to STEP PLAN Participants and engaged in self-dealing by funneling STEP PLANS assets to the BENISTAR 419 Plan, which BENISTAR and CARPENTER know or should know will not provide the tax effect desired by participating employers or employees.

200.   The STEP PLANS suffered a loss, and Plaintiffs and the other Class members were damaged, because of the violation of Defendants' fiduciary duties.

201.   As Fiduciaries, Defendants were responsible for the prudence of investments in

the subject STEP Plan during the Class Period unless Participants in each STEP Plan themselves exercised effective and informed control over the assets in the Plan in their individual accounts pursuant to ERISA and the regulations promulgated under it.

202. By investing in only certain types of insurance policies and not modifying the insurance policies in conjunction with financial conditions of 2001 through 2003, Defendants have failed to effectively and prudently manage the Plan assets.

203. By having uninsured risks to the STEP PLANS, Defendants failed to prudently manage the STEP PLANS.

204. The STEP PLANS also suffered a loss, and Plaintiffs and the other Class members were damaged, by Defendants' above-described conduct during the Class Period, and before, because Defendants' materially deceptive statements, acts and omission were fundamentally designed to deceive Plaintiffs and the other Class members. Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, Defendants' above-described statements, acts and omissions constituted misrepresentations and omissions that were fundamentally deceptive concerning the deductibility and tax status of the STEP PLANS and were material to any reasonable person's decision about whether or not to invest or maintain any part of their Plan assets in each STEP Plan. Plaintiffs and the other Class members are therefore presumed to have relied to their detriment on Defendants' deceptive statements, acts, and omissions.

205. Plaintiffs further contend that the subject STEP PLANS suffered a loss, and Plaintiffs and the other Class members were damaged, by Defendants' above-described conduct

during the Class Period, and before, because that conduct fundamentally deceived Plaintiffs and the other Class members about the prudence of making and maintaining investments in the STEP PLANS, Plaintiffs and the other Class members relied to their detriment upon Defendants' materially deceptive statements, acts and omissions.

206.    Plaintiffs further contend that the subject STEP PLANS suffered a loss due to improper assessment and other charges caused by Defendants' mismanagement and self-benefiting transactions, which were in Defendants' own best interest and not that of the Plan and Plan Participants.

207.    ERISA § 502 (a) (2) (29 U.S.C. § 1132(a)(2)) authorizes a Plan participant to bring a civil action for appropriate relief under section 409 (29 U.S.C. § 1109). Section 409 requires "any person who is a fiduciary who breaches any of the duties imposed upon Fiduciaries to make good to such Plan any losses to the Plan." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

208.    With respect to the calculation of the losses to a Plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants and beneficiaries in the Plan would not have made or maintained their investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered and improper assessments had not been made.

WHEREFORE, pursuant to the ERISA breaches of fiduciary duty, PLAINTIFFS and the Class pray that this Court enter judgment in their favor and against DEFENDANTS:

(i)     a monetary payment from the Defendants to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as required by ERISA § 409(a) (29 U.S.C. § 1109(a));

(ii)    injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2)&(3) (29 U.S.C. §§ 1109(a) and 1132(a)(2)&(3));

(iii)   reasonable attorney fees and expenses as provided by ERISA § 502(g) (29 U.S.C. § 1132(g)), the common fund doctrine, and other applicable law;

(iv)    taxable costs; and

(v)     interest on some or all of these amounts as provided by law.

WHEREFORE, pursuant to the common law breaches of fiduciary duty, PLAINTIFFS and the Class pray that this Court enter judgment in their favor and against DEFENDANTS:

(i)     for compensatory damages, together with pre-judgment and post-judgment interest;

(ii)    for punitive damages together with pre-judgment and post-judgment interest;

(iii)   for costs of suit;

(iv)    for attorneys fees; and

(v)     for such other and further relief as the Court may deem just and proper.

## COUNT II
## BREACH OF DUTY OF DUE CARE
## AGAINST
## DEFENDANTS MELLON AND TEPLITZKY

209.   Plaintiffs reallege and incorporate the above paragraphs as though they were fully

forth herein.

210.   BENISTAR and its affiliate STEP SERVICES became associated with the STEP PLANS at the behest and action of TEPLITZKY.

211.   TEPLITZKY was Plan Administrator before BENISTAR, and its affiliates.

212.   During the relevant period, MELLON was the Trustee of the STEP Plans.

213.   MELLON and TEPLITZKY owed a duty to the STEP Employer Sponsors, Plan Participants, and Beneficiaries.

214.   On information and belief, BENISTAR, STEP SERVICES, BENISTAR ADMIN, URSEY, and CARPENTER became associated with STEP and the STEP PLANS with the intention of looting the STEP PLANS assets directly or indirectly.

215.   In connection with their scheme, on information and belief, BENISTAR and CARPENTER anticipated that they would be able to divert to their own use a substantial amount of the STEP Plan assets by demanding 20% or 10% of the assets attributable to each employer's participation, or generating insurance commissions on the churning of policies to the BENISTAR 419 Plan, or generating administration and other fees with respect to the BENISTAR 419 Plan.

216.   Prior to the acquisition of control of the STEP PLANS by BENISTAR and its affiliates," CARPENTER and other BENISTAR "affiliates" had been accused of and since found liable for misappropriating other trust assets, in an amount not less than $7 million.

217.   On information and belief, Defendants MELLON, TEPLITZKY and the other fiduciaries failed to exercise proper fiduciary duty on behalf of the STEP PLANS Participants, and failed to fully investigate BENISTAR and CARPENTER.

218.   The failure to properly investigate occurred because Defendants MELLON and

TEPLITZKY were either receiving compensation from BENISTAR or because they were negligent.

219.    TEPLITZKY and other STEP Plan Fiduciaries failed to stop BENISTAR, BENISTAR ADMIN, and STEP SERVICES from perpetrating their scheme to loot STEP.

220.    As a result of the aforesaid, hundreds of STEP Plan Participants have been harmed, and value attributable to the STEP Plan has been diverted away from the STEP Plan Participants.

WHEREFORE, PLAINTIFFS pray that this Court enter judgment in their favor and against DEFENDANTS:

       (i)     for compensatory damages, together with pre-judgment and post-judgment interest;

       (ii)    for punitive damages together with pre-judgment and post-judgment interest;

       (iii)   for costs of suit;

       (iv)   for attorneys fees; and

       (v)    for such other and further relief as the Court may deem just and proper.

## COUNT III
## BREACH OF DUTY OF DUE CARE
## AGAINST
## DEFENDANTS PRUDENTIAL, MURPHY, CLU

221.    Plaintiffs reallege and incorporate the above paragraphs as though they were fully set forth herein.

222.    During the relevant period, STEP PLAN assets included insurance policies procured through PRUDENTIAL, MURPHY, and CLU.

223.    During the Class Period, PRUDENTIAL, MURPHY, and CLU received valuable

consideration for the issuance and sale of insurance policies to the STEP PLANS.

224.    PRUDENTIAL, MURPHY, and CLU were aware that the STEP PLANS were purported to be welfare benefit Plans.

225.    PRUDENTIAL, MURPHY, and CLU owed a duty to S&D, S&D STEP PLAN Participants, the STEP PLAN'S Employer Sponsors, and the STEP PLANS Participants.

226.    On information and belief, BENISTAR, STEP SERVICES, BURSEY, and CARPENTER became affiliated with the STEP PLANS with the intention of misappropriating Plan assets.

227.    In connection with their scheme, on information and belief, BENISTAR, STEP SERVICES, BENISTAR ADMIN, BURSEY, and CARPENTER anticipated that they would be able to divert to their own use a substantial amount of the STEP Plan assets by demanding 20% or 10% of the assets attributable to each employer's participation, or generating insurance commissions on the churning of policies to the BENISTAR 419 Plan, or generating administration and other fees with respect to the BENISTAR 419 Plan.

228.    During the Class Period, on information and belief, demutualization proceeds from various insurance carriers, including PRUDENTIAL, were paid on behalf of insurance policies held by the STEP PLANS.

229.    On information and belief, MELLON, TEPLITZKY, BENISTAR, and the other Fiduciaries failed to properly credit the STEP PLANS with the demutualization proceeds.

230.    PRUDENTIAL, MURPHY, and CLU failed to fully investigate the nature of the payment of the demutualization proceeds to the STEP PLANS.

231.    Upon information and belief, PRUDENTIAL, MURPHY, and CLU allowed the demutualization proceeds to be credited to entities other than the STEP PLANS.

2003    12:28    EDWARDS & ANGEL → 12039696020                               P042

232. The failure to properly investigate occurred because PRUDENTIAL, MURPHY, and CLU were negligent.

233. PRUDENTIAL, MURPHY, and CLU failed to stop BENISTAR, BENISTAR ADMIN, STEP SERVICES, BURSEY and CARPENTER from perpetrating their scheme to loot STEP Plan demutalization proceeds.

234. As a result of the aforesaid, hundreds of STEP Plan Participants have been harmed, and value attributable to the STEP PLANS has been diverted away from the STEP PLAN'S Plan Participants.

WHEREFORE, PLAINTIFFS pray that this Court enter judgment in their favor and against DEFENDANTS:

      (i)     for compensatory damages, together with pre-judgment and post-judgment interest;

      (ii)    for punitive damages together with pre-judgment and post-judgment interest;

      (iii)   for costs of suit;

      (iv)   for attorneys fees; and

      (v)    for such other and further relief as the Court may deem just and proper.

## COUNT IV
### VIOLATION OF THE CONSUMER FRAUD AND DECEPTIVE PRACTICES ACT AGAINST DEFENDANTS INSURANCE COMPANIES, MURPHY, CLU, and LEVY

235. Plaintiffs reallege and incorporate the above paragraphs as though they were fully set forth herein.

236. During the relevant period, STEP Plan assets included insurance policies procured

rough INSURANCE COMPANIES, MURPHY, CLU, and LEVY.

237.   During the class period, INSURANCE COMPANIES, MURPHY, CLU, and EVY received valuable consideration for the sale of insurance policies to the STEP PLANS.

238.   Defendants' INSURANCE COMPANIES, MURPHY, CLU, and LEVY conduct volved trade practices directed to the market generally and/or otherwise implicated consumer otection concerns regarding insurance practices.

239.   During the class period, INSURANCE COMPANIES, MURPHY, CLU, and EVY actively promoted the STEP Plan with the statements that the STEP PLANS were rported to be welfare benefit Plans consistent with IRC and ERISA provisions.

240.   INSURANCE COMPANIES, MURPHY, CLU, and LEVY made statements rough the marketing materials produced and distributed to S&D, S&D STEP PLAN ARTICIPANTS, and upon information and belief, the other STEP PLANS Employer Sponsors d Plan Participants.

241.   Upon information and belief, these same marketing materials were also freely stributed throughout the class.

242.   Upon information and belief, INSURANCE COMPANIES, MURPHY, CLU, and EVY were aware that the disability provisions of each STEP Plan were not fully insured and/or uaranteed as required by IRC and ERISA regulations.

243.   The STEP PLANS did not comport with the IRC and ERISA provisions.

244.   Upon information and belief, INSURANCE COMPANIES, MURPHY, CLU, and EVY continued to actively market the STEP PLANS even after the commencement of the oastal case.

245.   INSURANCE COMPANIES, MURPHY, CLU, and LEVY were aware or should

have known that these statements regarding the tax and ERISA status of the STEP Plan were false and/or deceptive.

246.    INSURANCE COMPANIES, MURPHY, CLU, and LEVY made these statements regarding the tax and ERISA status of the STEP Plan with the knowledge and purpose that the STEP PLANS employer sponsors, Plan Participants, and beneficiaries would rely on these statements.

247.    The STEP PLANS employer sponsors and Plan Participants relied upon these statements regarding the tax and ERISA status of the STEP PLANS.

248.    Without these statements and representations, employer sponsors, such as S&D and upon information and belief other employer sponsors would not have participated in STEP PLANS.

249.    As a result of the aforesaid, hundreds of STEP PLANS Participants and employer sponsors have been harmed, and value attributable to the STEP PLANS has been diverted away from the STEP PLANS Plan Participants.

WHEREFORE, PLAINTIFFS pray that this Court enter judgment in their favor and against Defendants:

        (i)      for treble compensatory damages, together with pre-judgment and post-judgment interest;

        (ii)     for punitive damages together with pre-judgment and post-judgment interest;

        (iii)    for costs of suit;

        (iv)    for attorneys fees; and

        (v)     for such other and further relief as the Court may deem just and proper.

## COUNT VI
## APPLICATION FOR PRELIMINARY INJUNCTION
## AGAINST
## BURSEY, CARPENTER, STEP SERVICES, BENISTAR, BENISTAR ADMIN

250. Plaintiffs reallege and incorporate the above paragraphs as though they were fully set forth herein.

251. As explained above, the fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a Plan with an "eye single" to the interests of the Participants and beneficiaries, regardless of the interests of the Fiduciaries themselves or the Plan sponsor.

252. Defendants BURSEY, CARPENTER, STEP SERVICES, BENISTAR, and BENISTAR ADMIN have breached their duty to avoid conflicts of interest not only in the ways described above, but also, by threatening to constructively withdraw/terminate employers who question the Defendants' BURSEY, CARPENTER, STEP SERVICES, BENISTAR, and BENISTAR ADMIN actions or attempt to transfer to another welfare benefit Plan.

253. As a result of aforementioned breaches of the STEP PLANS and the misappropriation of other trust assets, upon information and belief Defendants BURSEY, CARPENTER, STEP SERVICES, and BENISTAR have forfeited their respective insurance policies for any present and/or future fiduciary breaches against Plaintiffs.

254. As a result of the aforementioned breaches, Plaintiffs are suffering immediate irreparable harm because BURSEY, CARPENTER, STEP SERVICES, and BENISTAR are threatening to terminate the Plan and loot the Plan assets for its use.

255. Plaintiffs do not have an adequate remedy at law.

256. Plaintiffs have a clear right to relief in that Defendants have breached their

fiduciary duties by engaging at self-dealing behavior at the expense of the Participants.

257.   The grant of a preliminary injunction will merely preserve the status quo.

258.   Greater injury will be done by refusing the preliminary injunction than by granting it.

259.   As a direct and proximate result of Defendants' breaches and other wrongful conduct, S & D and other similarly situated employers will suffer immediate irreparable harm by the termination of their Plans and the loss of benefits to the Participants.

WHEREFORE, Plaintiffs demand judgment as follows:

(a)   DEFENDANTS shall immediately separate from the STEP Plan and Trust all the insurance policies and/or proceeds from such policies if the policies are no longer in effect on the lives of the partners and employees of Sanchez & Daniels, and shall immediately deliver those policies, with all cash values and rights attendant thereto, and all other assets attributable to the participation of Sanchez & Daniels in the Sanchez & Daniel STEP Plan, to Manuel Sanchez or such other person or entity he shall designate, as Trustee, to hold such assets in trust for the benefit of said partners and employees until further order of this Court.

(b)   DEFENDANTS are enjoined from subtracting any amount, including without limitation, fees, costs, or other expenses or reductions, from the policies so transferred or to any policies associated with the Plaintiffs; and DEFENDANTS shall restore, prior to any such transfer, any subtractions to all Plaintiffs' policies that occurred in 2002.

(c)   DEFENDANTS are enjoined from taking any action detrimental to Sanchez & Daniels, its employees or partners, or any Plaintiff until further order of this Court; however, DEFENDANTS may appear and defend this action provided, DEFENDANTS use no assets of any STEP Plan and Trust to appear, defend, or participate in this case and any case

Case 1:03-cv-00155-OMS Document 1 Filed 03/03/03 Page 50 of 53 PageID #:50 NO. 981 P047

ating to the claims made by Sanchez & Daniels or other Plaintiffs.

        (d)    Further necessary or proper relief, including monetary damages,

inctive relief, attorney fees, interest, costs of suit, punitive damages, and any other relief the

urt deems appropriate.


ated: February 13, 2003          By:    _____

                                     Larry S. Fischer (Firm No. 37434)
                                     Anderson Kill & Olick, P.C.
                                     190 S. LaSalle Street
                                     Suite 800
                                     Chicago, Il 60603
                                     Telephone: 312-857-2500

                                     Attorneys for Plaintiffs

NO. 981   D048

## VERIFICATION

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedures, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Subscribed and Sworn to before me

on this 14th day of February 2003.

_Hollis Talarico_

Notary Public

My commission expires:

OFFICIAL SEAL
HOLLIS TALARICO
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11-15-2004



# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Northern District of Illinois.

03C 1550

| | | | |
|---|---|---|---|
| **Plaintiff**(s): **John Daniels, et al.** | | **Defendant**(s):**Wayne Bursey, et al.** | |
| County of Residence: Cook | | County of Residence: | |
| Plaintiff's Atty: | Larry S. Fischer Anderson Kill & Olick 190 S. LaSalle St, Ste 800, Chicago, IL 60603 312-857-2500 | Defendant's Atty: | Jack E. Robinson 2187 Atlantic Street, Stamford, CT 06902 203-425-4500 |

DOCKETED
MAR 0 4 2003

II. Basis of Jurisdiction:          **3. Federal Question (U.S. not a party)**

JUDGE KENNELLY

III. Citizenship of Principal Parties
**(Diversity Cases Only)**
          Plaintiff:-**N/A**
          Defendant:-**N/A**

FILED-ED4
03 MAR -3 PM 1:35

IV. Origin :          **2. Removed From State Court**

V. Nature of Suit:          **791 E.R.I.S.A**

VI.Cause of Action:          **Claim for benefits under an ERISA plan. Original and exclusive jurisdiction under 29 USC 1132.**

VII. Requested in

Complaint
        Class Action:
        Dollar Demand:
        Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature: _____

Date: _____ 3/1/03 _____

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form
using the *Back* button in your browser and change it. Once correct, print this form, sign and
date it and submit it with your new civil action. **Note: You may need to adjust the
font size in your browser display to make the form print
properly.**                    **Revised: 06/28/00**