# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1550 | **DATE** | 4/14/2004 |
| **CASE TITLE** | Daniels vs. Bursey | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   For the reasons set forth on the attached Memorandum Opinion and Order, the Court grants Prudential's Motion to dismiss (124) except as to Count 2. The Court grants Murphy's motion to dismiss (122) in its entirety. The Insurance Companies' motion to dismiss is granted as to Counts 1,4,6,7, and 8 but denies it as to Counts 2 and 5 (121). The Court grants the Administrative defendants' motion to dismiss and strike the second amended complaint (123-1,2) as to Counts 1 and 7, denies the motion as to Counts 2,3, and 8, and denies in part and grants in part the motion as to Count 6. U.S. Trust's motion to dismiss is granted as to Counts 1,6,7 and 8 but denied as to Count 2 (161).

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | |
| | No notices required. | | | number of notices | |
| | Notices mailed by judge's staff. | | APR 19 2004 | | |
| | Notified counsel by telephone. | | date docketed | | |
| ✓ | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| OR | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

JOHN DANIELS, et al., and similarly ) 
situated individuals, )
                                   )
          Plaintiffs, )
                                     )
      vs. )         **Case No. 03 C 1550**
                                     )
WAYNE BURSEY, et al., )
                                     )
          Defendants. )

## AMENDED
## MEMORANDUM OPINION AND ORDER[1]

MATTHEW F. KENNELLY, District Judge:

This case concerns the marketing and administration of a "severance trust executive program" (STEP) plan, a type of employee welfare benefit plan targeted to employers with highly compensated employees. John Daniels and Manuel Sanchez, along with other partners and employees of the Chicago-based Sanchez & Daniels law firm, and on behalf of a putative class of STEP Plan investors, sued Step Plan Services, Inc., its principals, and several insurance companies, alleging that the defendants violated the Employee Retirement Income Security Act (ERISA) and the Illinois Consumer Fraud Act and claiming fraudulent inducement and breach of fiduciary duty in connection with their actions in promoting or managing the STEP Plan. Several of the defendants filed a motion to dismiss the original complaint, which the Court granted in part and denied in part. *Daniels v. Bursey*, No 03 C 1550, 2003 WL 22053580 (N.D. Ill. Sept. 3,

---

[1] The Court's original ruling in this case, dated March 18, 2004, has been amended as a result of Plaintiffs' motion for reconsideration.

2003).

Plaintiffs amended their complaint, pleading the same claims originally filed and adding four claims asserting violations of state insurance laws and the Racketeer Influenced and Corrupt Organizations Act (RICO). Defendants Wayne Bursey, Daniel Carpenter, STEP Plan Services, Inc., Benistar Insurance Group, Inc., Mellon Trust of New York, Teplitzky & Company, Benistar 419 Plan Services, Inc., Benistar 419 Admin Services, Inc., Benistar 419 Plan, Benistar Employer Services Trust Corp., and Benistar, Ltd. (collectively referred to as "Administrative Defendants"); U.S. Trust; National Life Insurance Co., Allmerica Financial Benefit Insurance Co., New York Life Insurance Co., Metropolitan Life Insurance Co., and Hartford Life Insurance Co. (collectively referred to as "the Insurance Companies"); Prudential Insurance Co. of America; and Thomas Murphy have each moved to dismiss Plaintiffs' second amended complaint. For the reasons stated below, the Court grants the motions in part and denies them in part.

**Factual Background**

For purposes of considering the five motions to dismiss before us, the Court accepts as true plaintiffs' well-pleaded factual allegations. *Thompson v. Illinois Dept. of Professional Regulation*, 300 F.3d 750, 753 (7th Cir. 2002). Sanchez & Daniels is a Chicago law firm. In 1995 it adopted a STEP Plan, a type of employee benefit plan that Plaintiffs allege, at least in the alternative, is governed by ERISA. 2d Amended Compl. ¶¶ 139-40. In 1998 approximately 255 employers participated in the STEP Plan.[2] *Id.* ¶ 90. The STEP Plan was administered by the

---

[2] Plaintiffs state that each employer participant had its own plan; Defendants state that all the employers participated in one plan. For purposes of the motions to dismiss, the Court will refer to the STEP Plan as a single, multi-participant plan.

Administrative Defendants and U.S. Trust. *Id.* ¶¶ 63-65. The Plan was devised as "a vehicle for employers to allegedly purchase life insurance on a tax deductible basis," *id.* ¶ 83, and was "designed to provide Participants with (1) death benefits, (2) disability benefits, and (3) severance benefits." *Id.* ¶ 86. A substantial amount of the Plan's assets were variable insurance policies issued and administered by the Insurance Companies and Prudential. *Id.* ¶ 68. Plaintiffs allege the Insurance Companies managed these policies negligently or with willful disregard, resulting in losses to the STEP Plan. *Id.* ¶ 74.

Sanchez & Daniels and its partners and employees allege that the Plan's promoters fraudulently induced them – through marketing materials and an opinion letter from a lawyer to adopt the STEP Plan by falsely representing that contributions to the Plan would be tax deductible, could not be reached by creditors and could easily be withdrawn by Plan participants. *Id.* ¶¶ 96-97, 100, 112-17,123-24, 144, 146. According to Plaintiffs, the Plan was not tax deductible, the Plan's assets were not protected from creditors and participants could not easily make withdrawals from the Plan. *Id.* ¶¶ 132-33, 139-41, 145, 147, 272-75. The Plan promoters knew the IRS had found that contributions to the STEP Plan made by a Plan participant were not tax deductible, *id.* ¶¶ 272-75, and the Administrative Defendants used assets from the Plan to fund litigation challenging the IRS's determination that contributions to the STEP Plan were not tax deductible. *Id.* ¶ 278. The case ended in stipulations by the parties that 75 percent of the contributions to the STEP Plan for the years in question were not deductible, that fines would be assessed, and that employee participants in the Plan would be assessed with additional taxable income, penalties and interest. *Id.* ¶ 279. The IRS issued proposed regulations on July 11, 2002, stating that contributions to the STEP Plan were not tax deductible because the Plan did not

3

qualify for deductions under Section 419A(f)(6) of the Internal Revenue Code. *Id.* ¶ 288. However, the Administrative Defendants never warned the Plan participants, such as Sanchez & Daniels, that the contributions were not deductible. *Id.* ¶¶ 282-87. Plaintiffs allege that they and other employers participated in the STEP Plan primarily for the promised tax advantages, and that if they had known of the IRS's ruling, they would have withdrawn from the Plan. *Id.* ¶¶ 284-86.

Plaintiffs argue the Insurance Companies not only marketed the STEP Plans long after learning their benefits were dubious, *id.* ¶¶ 132-33, 148, 281-83, they also discouraged Plan participants from using Plan assets to buy annuities, municipal bonds, other tax-free investments, or term insurance in lieu of permanent insurance, which yielded higher commissions to the Insurance Companies and their agents than did other types of investments. *Id.* ¶¶ 149-55, 243-52. Plaintiffs further allege that when the stock market began to decline, the Insurance Companies failed to allocate the Plan's insurance funds from variable accounts to safer accounts, resulting in substantial losses to the value of the Plan. *Id.* ¶¶ 253-55.

Plaintiffs further allege that because the STEP Plan purported to provide unemployment and insurance benefits to those participants who paid a premium for the benefits, the Plan constituted an insurance arrangement. *Id.* ¶ 161-64. Plaintiffs allege the Plan operated as an unlicensed insurance company in violation of state insurance codes. *Id.* ¶ 170-71. Plaintiffs claim the Insurance Companies should have known they were promoting operations of an unlicensed insurance carrier. *Id.* ¶¶ 256-57. Plaintiffs' final allegation against the Insurance

Companies is that when Prudential demutualized,[3] Prudential and Murphy allowed the proceeds that were paid to holders of its insurance policies to be distributed to the Plan's Trustees (the Administrative Defendants) without ensuring that the funds were actually credited to the Plan. *Id.* ¶¶ 264-71. Plaintiffs characterize this alleged lack of oversight as negligent and claim that Prudential and Murphy are responsible for allowing the Plan fiduciaries to loot the demutualization proceeds. *Id.*

Plaintiffs further allege that the Plan's fiduciaries, which Plaintiffs identify as the Administrative Defendants, mismanaged the Plan, amending its structure without authorization and misappropriating or looting its assets. *Id.* ¶¶ 63-64, 177-92. Plaintiffs allege that when control of the STEP Plan was assumed by Benistar, Plaintiffs were not informed that a Massachusetts jury had found that a Benistar affiliate and its principal Carpenter had breached their fiduciary duties, converted property of a trust and made intentional misrepresentations. *Id.* ¶¶ 225, 227. Carpenter had used money held by the Benistar Entities in trust to engage in risky options trading. *Id.* ¶ 235(g). On September 23, 2003, a Massachusetts Superior Court judge awarded the plaintiffs in that case $25,952,450. *Id.* ¶ 226, 228. The judge pierced the corporate veil, holding the Benistar Entities liable for the entire judgment.[4] *Id.* ¶¶ 236-37.

In addition to administrating the STEP Plan, Benistar also operated the Benistar 419

---

[3] In 2001 Prudential demutualized, meaning it changed from being owned by policyholders to being owned by shareholders. The demutualiztion process required Prudential to distribute stock to certain policyowners, including the Trustee of the STEP Plans.

[4] The Administrative Defendants argue that the paragraphs of the second amended complaint (¶¶ 225-42) describing the Massachusetts litigation "should be stricken as immaterial, impertinent, and scandalous matter." Admin. Defs. Mot. at 2. The request is denied, but we reserve for a later date the question of whether evidence regarding the Massachusetts action is admissible.

Plan, which it marketed as a Section 419A(f)(6) arrangement funded with life insurance policies. *Id.* ¶ 196. Plaintiffs allege that the Administrative Defendants knew the Benistar 419 Plan did not comply with Section 419A(f)(6), because the IRS proposed regulations and issued a private ruling saying such, and two Tax Court decisions held that the Benistar 419 Plan is not a welfare benefit plan for tax purposes. *Id.* ¶¶ 198-99.

Plaintiffs assert that when they tried to remove their assets from the STEP Plan in 2001, the Administrative Defendants advised them that they – and all other participants in the STEP Plan – would lose 20 percent of their assets in the Plan if they withdrew outright but would lose only 10 percent if they rolled their STEP Plan assets into the 419 Plan being marketed by Benistar. *Id.* ¶¶ 200, 205. According to Plaintiffs, the Administrative Defendants would benefit not only from the 10 to 20 percent assessment, but also from insurance commissions and administrative fees they would derive if the employers opted to transfer their assets into the 419 Plan. *Id.* ¶¶ 209-13. Sanchez & Daniels refused to accept either alternative. *Id.* ¶ 216. Plaintiffs allege that in retaliation for the law firm's demand that its Plan assets be transferred to a plan other than the 419 Plan, the Administrative Defendants sued Sanchez & Daniels for defamation. *Id.* ¶ 218. Sanchez & Daniels further alleges that the Administrative Defendants "threatened to dissipate the assets attributable to [Sanchez & Daniels'] employees, and to discriminate against [them] as of December 2, 2002." *Id.* ¶ 220. Plaintiffs claim similar threats were made to other employers who questioned the Administrative Defendants handling of the Plan. *Id.* ¶ 221. They allege that other STEP Plan participants would not have agreed to rollover their assets to the 419 Plan had they known of the outcome of the Massachusetts litigation. *Id.* ¶ 242.

## Analysis

When considering a motion to dismiss for failure to state a claim upon which relief can be granted, the Court reads the complaint liberally, granting the motion only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conely v. Gibson*, 355 U.S. 41, 45-46 (1957) (footnote omitted). That means we must take all statements of fact in the complaint as true and must draw reasonable inferences in favor of Plaintiffs. *Dixon v. Page*, 291 F.3d 485, 486-87 (7th Cir. 2002) (citing *Massey v. Wheeler*, 221 F.3d 1030, 1034 (7th Cir. 2000)). Generally speaking, plaintiffs "need not set out in detail all of the facts upon which they base their claim." *Boim v. Quranic Literacy Institute and Holy Land Foundation for Relief and Development*, 291 F.3d 1000, 1008 (7th Cir. 2002) (citing Fed. R. Civ. P. 8(a)). "Rule 8(a) requires only that the complaint give the defendants fair notice of what their claim is and the grounds upon which it rests." *Id.* (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)).

However, the pleading requirements are different when a plaintiff alleges fraud. Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). This particularity requirement applies to claims under the Illinois Consumer Fraud and Deceptive Business Practices Act, *Petri v. Gatlin*, 997 F. Supp. 956, 973 (N.D. Ill. 1997), and to claims of mail and wire fraud alleged as examples of racketeering activity under RICO. *Slaney v. Int'l Amateur Athletic Federation*, 244 F.3d 580, 597 (7th Cir. 2001). "Although states of mind may be pleaded generally," to satisfy Rule 9(b), "the circumstances must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). When alleging the who, what, when, where and how, a plaintiff may

7

not lump the defendants together in a group; rather, the plaintiff must specify each defendant's participation in the alleged fraud. *See Viacom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 778 (7th Cir. 1994).

These strict pleading requirements are not without exceptions. The Seventh Circuit has recognized that "the particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim." *Corley v. Rosewood Care Center, Inc. of Peoria*, 142 F.3d 1041, 1051 (7th Cir. 1998); *Emery v. American General Finance, Inc.*, 134 F.3d 1321, 1323 (7th Cir. 1998) ("We don't want to create a Catch-22 situation in which a complaint is dismissed because of the plaintiff's inability to obtain essential information without pretrial discovery (normally of the defendant, because the essential information is in his possession and he will not reveal it voluntarily) that she could not conduct before filing the complaint."). But the particularity requirement cannot be relaxed too much: "[t]he purpose (the defensible purpose, anyway) of the heightened pleading requirement in fraud cases is to force the plaintiff to do more than the usual investigation before filing his complaint." *Ackerman v. Northwestern Mutual Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). "By requiring the plaintiff to allege the who, what, where, and when of the alleged fraud, the rule requires the plaintiff to conduct a precomplaint investigation in sufficient depth to assure that the charge of fraud is responsible and supported, rather than defamatory and extortionate." *Id.* We review Plaintiffs' second amended complaint in light of these standards.

Before the Court addresses Defendants' claim-specific arguments, we will deal with several overarching arguments the Administrative Defendants make as to why they as a group and as individuals should be dismissed from the second amended complaint. First, they argue

8

that the Benistar entities named for the first time in the second amended complaint should be dismissed from the suit, claiming that Plaintiffs raised no allegations of wrongdoing by the Benistar 419 Plan and the other newly named entities. The Court disagrees. The second amended complaint articulates a theory of how the newly named Benistar entities are culpable for the alleged misdeeds of the previously named Administrative Defendants. Plaintiffs allege that all the Benistar entities are controlled by Carpenter, 2d Amended Compl. ¶ 201, and that Benistar offered disadvantageous terms for withdrawing from the STEP Plan so that Plaintiffs would rollover their assets into the Benistar 419 Plan. *Id.* ¶¶ 204-42. Plaintiffs are alleging that the previously named Benistar entities were acting either at the behest or for the benefit of Carpenter and the newly named Benistar entities that Carpenter controlled. Plaintiffs' allegations sufficiently link the newly named Benistar entities to the other Administrative Defendants to include them as defendants.

Second, the Administrative Defendants argue that Sanchez & Daniels lacks standing to complain of much of the behavior described in the second amended complaint because it occurred after the firm withdrew from the Plan. Plaintiffs allege that when they attempted to withdraw from the Plan, Benistar informed them that by doing so they had forfeited to Benistar the assets in the Plan. *Id.* ¶ 218. Because Plaintiffs dispute Benistar's right to withhold its assets, there is an issue of fact as to whether Sanchez & Daniels continued to have an interest in Benistar's management of the retained funds. Furthermore, the Administrative Defendants concede that even after Plaintiffs froze their Plan benefits, Sanchez & Daniels employees would be entitled to severance benefits whenever a severance event occurred. Admin. Defs. Mem. Ex. 2. Therefore, even under the Administrative Defendants' logic, Sanchez & Daniels would have

an interest in the management of the Plan until all employees received severance benefits, which, the Administrative Defendants state, never occurred. Thus Sanchez & Daniels has standing to challenge the Benistar Entities actions regarding the Plan.

Similarly, the Court rejects the Administrative Defendants' argument that because no severance event has occurred, Sanchez & Daniels has not been denied a severance benefit and, therefore, any claims arising from Benistar's takeover of the administration of the Plan and subsequent looting are unripe. Plaintiffs allege that they should have been able to transfer all their assets from the STEP Plan to another trust, rendering the ongoing denial of that request an injury that is ripe for potential redress.

We now turn to the profusion of count-specific reasons offered by Defendants for dismissing the second amended complaint.

*1.* *Count 1*

Count 1 alleges a claim not made in previous versions of the complaint. Plaintiffs claim that Defendants violated the insurance laws of all fifty states. But, as Murphy points out, Plaintiffs fail to identify in the second amended complaint which insurance laws have been broken. Defendants construe Plaintiffs' allegations in Count 1 as accusing Defendants of operating an unauthorized insurance arrangement in violation of state provisions requiring insurance companies to be licensed. Positing that only the insurance code of Illinois applies to Plaintiffs' claims, the Insurance Companies argue that Count 1 should be dismissed because the Illinois Insurance Code does not provide a private right of action to sue an insurance company for operating without a license. Plaintiffs respond by pointing to two provisions of the Illinois Insurance Code that provide a private right of action. For the reasons stated below, Plaintiffs'

response does not salvage this vague claim.

For Count 1 to survive, Plaintiffs have to identify which insurance provisions they allege were violated by Defendants; they are not entitled to fling the entirety of fifty states' insurance codes against the wall in the hope that some unnamed provision will stick. Murphy states in his reply brief that Plaintiffs must do so in the text of the complaint, arguing any elaboration made in Plaintiffs' response brief "does not cure the defect in the Complaint." Murphy Reply at 2. But that is not the rule in the Seventh Circuit. "A complaint must narrate a *claim*, which means a grievance such as 'the City violated my rights by preventing me from renovating my apartments.' Having specified the wrong done to him, a plaintiff may substitute one legal theory for another without altering the complaint." *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997) (emphasis in original). Similarly, "a plaintiff may supplement the complaint with factual narration in an affidavit or brief." *Id.* (citing *Early v. Bankers Life & Casualty Co.*, 959 F.2d 75, 79 (7th Cir. 1992) and *Orthmann v. Apple River Campground, Inc.*, 757 F.2d 909, 914-15 (7th Cir. 1985)). In this context, that means that Plaintiffs can use their response briefs to identify the specific statutory provisions they claim were violated.[5] We now consider whether they have sufficiently done so.

The only statutory provisions Plaintiffs cite are provisions in the Illinois Insurance Code.[6] Plaintiffs are correct that "[i]t is unlawful for any insurer to transact insurance business in [Illinois] without a certificate of authority from the Director." 215 ILCS 5/121-2. But

---

[5] The obvious exception to this is Rule 9(b). But Count 1 does not allege fraud, so Rule 9(b) does not apply.

[6] In a footnote, Plaintiffs cite a Pennsylvania case that they say relied on a Pennsylvania provision analogous to 215 ILCS 5/121-4. But they do not cite the statute.

11

Defendants accurately point out that only the Director of Insurance can enforce this provision:

> Whenever the Director believes, from evidence satisfactory to him that any insurer is violating or about to violate Section 121-2 of this Act, the Director may, through the Illinois Attorney General, cause a complaint to be filed in the Circuit Court of Cook County, or the Circuit Court of Sangamon County, to enjoin and restrain that insurer from continuing such violation or engaging therein or doing any act in furtherance thereof. The court shall have jurisdiction of the proceeding and may make and enter an order or judgment awarding such preliminary or final injunctive relief as, in its judgment, is proper.

*Id.* § 121-5. Furthermore, any fines assessed for transacting insurance business without a license are recovered in the name of the People of the State of Illinois. *Id.* § 121(3). We found no case in which a private plaintiff has been permitted to sue under section 121-2. We agree with Defendants that Plaintiffs cannot sue Defendants under 215 ILCS 5/121 for operating an insurance business without a license, because there is no private right of action. *See Hamilton v. Safeway Insurance Co.*, 104 Ill. App. 3d 353, 356, 432 N.E. 2d 996, 999 (1982) (finding that statute providing that the Director of Insurance shall take action against a company engaging in improper claims practices implies there is no private right of action for improper claims practices).

In their response brief, Plaintiffs point to two provisions of the Illinois Insurance Code that they claim specify remedies available to victims. One of the provisions states, in relevant part:

> If any such unauthorized insurer fails to pay any claim or loss within the provisions of such an insurance contract, any person who assisted or in any manner aided directly or indirectly in the procurement of the insurance contract shall be liable to the insured for the full amount of the claim or loss as provided in that insurance contract.

215 ILCS 5/121-4. The second provision states:

(1) In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action reasonable attorney fees, other costs, plus an amount not to exceed any one of the following amounts:

(a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;

(b) $25,000;

(c) the excess of the amount which the court or jury find such party is entitled to recover, exclusive of costs, over the amount, if any, which the company offered to pay in settlement of the claim prior to the action.

215 ILCS 5/155.

These provisions specify remedies available to victims, but they do not impose substantive limitations on the conduct of insurers. They specify who can be sued and the remedies available when an insurance company fails to pay a claim, but a plaintiff relying on these provisions sues the insurance company for failing to pay a claim, not for violating the Illinois Insurance Code. Plaintiffs are not claiming that Defendants failed to pay a claim made under the STEP Plan; they are alleging that they were defrauded into adopting the STEP Plan and that they should have been able to withdraw their assets from the Plan. The Administrative Defendants' refusal to allow Plaintiffs to withdraw their funds does not constitute a denial of a claim or liability as the sections use those terms. The Court therefore dismisses Count 1.

2.    Counts 2 - 4

Plaintiffs allege in Count 2 that the Administrative Defendants and the Insurance Companies violated ERISA and breached the common law fiduciary duty they allegedly owed Plaintiffs; Count 3 alleges that Mellon Trust of New York and Teplitzky & Co. violated a common law duty of care owed to Plaintiffs; and Count 4 alleges Murphy and the Insurance

13

Companies violated a duty of care, good faith and fair dealing owed to Plaintiffs. These three claims appeared in Plaintiffs' original complaint as Counts 1 through 3.

Because Count 4 raises essentially the same allegations that we dismissed when they appeared in Count 3 of the original complaint, we will consider it first. In Count 3 of the original complaint, Plaintiffs alleged that Prudential and Murphy breached a common law duty of care owed to Plaintiffs by failing to ensure that the Prudential demutualization proceeds owed to the Plan were actually paid to the Plan instead of pocketed by the Administrative Defendants; Count 4 of the Second Amended Complaint alleges that the Insurance Companies and Murphy breached the common law duty of care owed to Plan participants other than Sanchez & Daniels by failing to ensure that Prudential demutualization proceeds owed to the Plan were actually paid to the Plan instead of pocketed by the Administrative Defendants. We dismissed Count 3 of the original complaint because it "d[id] not state a claim for breach of fiduciary duty, but rather appears to assert a novel claim based on an insurance company's alleged duty to monitor the financial dealings of its policyholders." *Daniels*, 2003 WL 22053580, at *2. Plaintiffs have done nothing to persuade the Court that this ruling was wrong. Count 4 of the Second Amended Complaint is therefore dismissed.

In Count 2, Plaintiffs offer a different theory for why the Insurance Companies owed Plaintiffs a fiduciary duty. Plaintiffs allege the Insurance Companies were fiduciaries because they had discretionary control over the variable life insurance policies held by the Plan. 2d Amended Compl. ¶ 303. Plaintiffs allege the Insurance Companies violated their fiduciary duties "by improperly investing the plan assets in variable contracts and then not properly monitoring the investments and diversifying when the markets began to plummet." *Id.* ¶ 305. Plaintiffs also

make allegations that we rejected with regard to Count 3 (formerly Count 4), namely that the Insurance Companies breached their fiduciary duty by failing to safeguard the assets managed by the Administrative Defendants. *Id.* ¶¶ 306-07. We will not revisit our determination that the Insurance Companies did not have a duty to assure that the Administrative Defendants fulfilled their fiduciary duties. We will, however, consider Plaintiffs' contention that Defendants had fiduciary duties related to their management of the insurance policies held by the Plan.

Plaintiffs cannot state a claim under ERISA against the Insurance Companies for breach of fiduciary duty unless they were in fact fiduciaries. *Plumb v. Fluid Pump Service, Inc.*, 124 F.3d 849, 854 (7th Cir. 1997) (citing *Klosterman v. Western Gen. Management, Inc.*, 32 F.3d 1119, 1122 (7th Cir. 1994)). ERISA identifies three types of duties that characterize a fiduciary:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C.A. § 1002(21)(A). Because fiduciary status depends on the extent to which the person performs certain tasks, "a person may be an ERISA fiduciary for some purposes, but not for others." *Plumb*, 124 F.3d at 854 (citations omitted). Plaintiffs allege the Insurance Companies and Murphy breached their fiduciary duties by investing Plan assets in variable insurance policies and not diversifying the investments when the market shifted. 2d Amended Compl. ¶ 305. Thus they can state a claim only if the Insurance Companies had fiduciary duties with respect to the management of the insurance policies. *See id.* at 854 (citing *Coleman v. Nationwide Life Insurance Co.*, 969 F.2d 54, 61 (4th Cir. 1992)). The Insurance Companies argue that the Plan

15

documents attached to the original complaint as exhibit A make clear that the Insurance Companies did not owe Plaintiffs a fiduciary duty with regards to the policies. It is appropriate for the Court to consider the Plan documents when confronted with a motion to dismiss a claim of breach of fiduciary duty, so we will do so. *See id.* at 854-55 (analyzing the plan documents to determine whether the district court properly dismissed claim).

The Seventh Circuit has noted that "an insurer generally will not be held to be a fiduciary with respect to an activity unless the plan documents show that the insurer was responsible for that activity." *Id.* at 854 (citing *Coleman*, 969 F.2d at 61). Defendants argue that the Plan documents state explicitly that the Insurance Companies had no discretion with respect to the investment of Plan assets in variable insurance policies. The Plan documents state that "the Trustee will . . . invest the assets of the Trust, including all Employer contributions . . . in variable life insurance contracts funded exclusively through the Conservatively Managed Flexible subaccount of the Prudential Variable Appreciable Account of the Insurer." Compl. Ex. A, § 5.1(a). In addition, Section 9.4 of the Plan states that the "Trustee shall . . . invest Fund assets in life insurance contracts provided by the Insurer in accordance with Section 5.1 of the Plan." Thus, the Plan documents make it clear that the Insurance Companies had no discretionary authority or control over whether the Plan assets were invested in variable insurance policies.

The Insurance Companies also correctly point out that they did not have "discretionary control over how the funds within the insurance policies were allocated." Ins. Co. Mem. at 16. The Plan documents specified that "[t]he Trustee shall have full and complete control over any life insurance policy acquired" by the Trust. Compl. Ex. A, § 5.1(b). The Plan documents, like

16

those in *Plumb*, specified that the Insurance Companies would only play an administrative and explicitly non-discretionary role: "It is understood by the parties hereto that while the Insurer will perform certain administrative functions with respect to the insurance policies, such duties do not involve the exercise of any discretionary authority or other authority to manage and control assets of the Trust." *Id.* § 9.12. To make the point even more clearly, the Plan documents state that "[i]n no event shall the Insurer be a fiduciary of the Plan." *Id.* § 13.10. In sum, the Plan documents defeat Plaintiffs' allegation that the Insurance Companies had fiduciary duties with respect to the investment in variable insurance policies and the management of the funds within those policies.

Although the heading for Count 2 alleges that the named defendants have breached fiduciary duties under both ERISA and the common law, Plaintiffs have failed to argue in their response to the Insurance Companies' motions to dismiss that the Insurance Companies had a common law fiduciary duty. They do argue in the alternative that even if the Insurance Companies are not ERISA fiduciaries, they should be held liable under § 502(a)(3) for aiding and abetting the Administrative Defendants' breach of their fiduciary duties. 2d Amended Compl. ¶ 308. The Seventh Circuit has stated reluctantly that nonfiduciaries cannot be held liable under ERISA for knowing participation in a fiduciary's misconduct. *Reich v. Continental Casualty Co.*, 33 F.3d 754, 757 (7th Cir. 1994) (relying on dicta in *Mertens v. Hewitt Associates*, 508 U.S. 248, 113 S. Ct. 2063, 124 L.Ed.2d 161 (1993) that applied "a strict constructionist's approach" that the Seventh Circuit "might not embrace as an original matter"). However, in *Harris Trust & Savings Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 120 S. Ct. 2180, 147 L.Ed.2d 187 (2000), the Supreme Court reinterpreted the dictum from *Mertens* relied upon by the Seventh

Circuit in *Continental Casualty*, effectively abrogating *Continental Casualty* itself.

In *Harris* the Supreme Court considered whether § 502(a)(3) of ERISA, codified at 29 U.S.C. § 1132(a)(3), provided a cause of action against a nonfiduciary "party in interest" to a transaction barred by § 406(a), which prohibits a plan fiduciary from engaging in a transaction with a party in interest. *See* 29 U.S.C. § 1106(a). The case originated in the Seventh Circuit, which relied on the same dictum from *Mertens* that it relied upon in *Continental Casualty* and concluded that "a nonfiduciary cannot be liable under § 502(a)(3) for participating in a § 406 transaction." *Harris*, 530 U.S. at 244. The Supreme Court reversed.

The Court recognized that § 406(a) of ERISA imposed a duty only on a fiduciary. *Id.* at 245 (citing 29 U.S.C. § 1106(a)(1)). But the Court rejected "the Seventh Circuit's and Salomon's conclusion that, absent a substantive provision of ERISA expressly imposing a duty upon a nonfiduciary party in interest, the nonfiduciary party may not be held liable under § 502(a)(3), one of ERISA's remedial provisions." *Id.* The Court stated "that § 502(a)(3) itself imposes certain duties, and therefore . . . liability under [§ 502(a)(3)] does not depend on whether ERISA's substantive provisions impose a specific duty on the party being sued." *Id.* (footnote omitted).

In arriving at this conclusion, the Court noted that "§ 502(a)(3) admits of no limit . . . on the universe of possible defendants." *Id.* at 246. The Court looked to § 502(*l*), another remedial provision of ERISA, to define the scope of § 502(a)(3). Section 502(*l*) states in relevant part that:

(1) In the case of –
      (A) any breach of fiduciary responsibility under (or other violation of )

18

part 4 of this subtitle by a fiduciary, or

(B) any knowing participation in such a breach or violation by any other person,

the Secretary shall assess a civil penalty against such fiduciary or other person in an amount equal to 20 percent of the applicable recovery amount.

29 U.S.C. § 1132(*l*)(1). The Court stated that "[t]he plain implication is that the Secretary may bring a civil action under § 502(a)(5) against an 'other person' who 'knowing[ly] participat[es]' in a fiduciary's violation." *Harris*, 530 U.S. at 248. The Court noted that "[t]his § 502(a)(5) action is available notwithstanding the absence of any ERISA provision explicitly imposing a duty upon an 'other person' not to engage in such 'knowing participation.'" *Id.* The Court reasoned that "if the Secretary may bring suit against an 'other person' under subsection (a)(5), it follows that a participant, beneficiary, or fiduciary may bring suit against an 'other person' under the similarly worded subsection (a)(3)." *Id.* at 248-49 (citing *Mertens*, 508 U.S. at 260). The Court found that § 502(*l*) "compels the conclusion that defendant status under § 502(a)(3) may arise from duties imposed by § 502(a)(3) itself, and hence does not turn on whether the defendant is expressly subject to a duty under one of ERISA's substantive provisions." *Id.* at 247.

The Supreme Court's meaning is clear: § 502(a)(3) (or (a)(5)) liability does not hinge "on whether the particular defendant labors under a duty expressly imposed by the substantive provisions of ERISA Title I," *id.* at 249, rather it hinges on whether he knowingly participated in a fiduciary's breach of a substantive provision of ERISA. Thus even though the Court has concluded that the Insurance Companies were not themselves fiduciaries, the Plaintiffs can still seek equitable relief under § 502(a)(3) against them for "knowing participation" in a breach of fiduciary duty by the Administrative Defendants.

19

The Insurance Companies read *Harris* more narrowly, insisting that it applies only to claims brought against a nonfiduciary party in interest for violations of § 406 and that the Insurance Companies are not parties in interest. The Court disagrees with this narrow reading of *Harris*. In *Harris* the Supreme Court interpreted § 502(a)(3), not § 406, and accordingly it governs any suit under § 502(a)(3) alleging a violation of any substantive provision of ERISA. The Court also disagrees with the Insurance Companies' claim that because § 405(a) – the so-called aiding and abetting statute – imposes a duty only on fiduciaries, Plaintiffs cannot sue the Insurance Companies under § 502(a)(3) for aiding and abetting the Administrative Defendants' breaches of fiduciary duty. *Harris* makes clear that a nonfiduciary does not have to labor under a duty imposed by a substantive provision of ERISA to be sued under § 502(a)(3). Section 406, like § 405(a), imposed a duty only on fiduciaries, yet the Supreme Court specifically stated that liability under § 502(a)(3) did not depend on whether the defendant had a duty under § 406. *Id.* at 249. In short, to plead a claim against a nonfiduciary under § 502(a)(3), the plaintiff need not allege that the nonfiduciary himself violated a substantive provision of ERISA. Rather, the plaintiff must allege only that a fiduciary violated a substantive provision of ERISA and the nonfiduciary knowingly participated in the conduct that constituted the violation. Under *Harris* a claim under § 502(a)(3) against a nonfiduciary essentially asserts that the nonfiduciary aided and abetted the fiduciary's breach – the plaintiff need not plead a violation of § 405(a) to reach the conduct.

To state a claim under § 502(a)(3) against the Insurance Companies, Plaintiffs must allege that (1) the Administrative Defendants violated a substantive provision of ERISA and (2) the Insurance Companies knowingly participated in the prohibited conduct. Plaintiffs have

20

alleged that the Administrative Defendants violated § 409 by breaching the fiduciary duty owed to Plan participants. 2d Amended Compl. ¶ 369. The Administrative Defendants – like the Insurance Companies before them – argue that they were not fiduciaries. However, the Plan documents quoted above make clear that the Administrative Defendants – including Teplitzky, the former Plan administrator, and Mellon, the trustee – were fiduciaries under ERISA; they had the discretion and authority to manage the assets in the Plan. This has two implications for the proceedings before us: the Administrative Defendants' motion to dismiss Counts 2 and 3 must be denied, and Plaintiffs have alleged the first element necessary to state a claim under § 502(a)(3) against a nonfiduciary.

Putting aside for a moment the Administrative Defendants' arguments for why Counts 2 and 3 should be dismissed even if they are fiduciaries, the Court will finish the analysis of whether Plaintiffs have stated a claim against the Insurance Companies under § 502(a)(3). Because Plaintiffs have stated a claim against the Administrative Defendants for a breach of fiduciary duty, the only question remaining is whether Plaintiffs have alleged that the Insurance Companies knowingly participated in the Administrative Defendants' breaches. In Count 2, Plaintiffs allege that the Insurance Companies, along with the Administrative Defendants, mismanaged the investment of Plan assets. *Id.* ¶¶ 305, 364. As discussed above, the Plan documents state that the Administrative Defendants and not the Insurance Companies had discretionary authority regarding the insurance policies. However, the fact that the Insurance Companies were not fiduciaries with regards to the Plan assets does not necessarily mean their handling of the insurance polices held by the Plan was passive or benign. Plaintiffs' allegations that the Insurance Companies mismanaged the Plan's investments, liberally construed as required

21

on a motion to dismiss, amounts to an allegation that the Insurance Companies knowingly participated in conduct that constituted a breach of fiduciary duty by those who controlled the Plan assets – that is, the Administrative Defendants. Plaintiffs have therefore stated a claim against the Insurance Companies under § 502(a)(3). Accordingly, the Court denies the Insurance Companies' motion to dismiss Count 2.

The Administrative Defendants argue that Count 2 should be dismissed because the partners of Sanchez & Daniels lack standing to sue under ERISA. Under ERISA, federal district courts have "exclusive jurisdiction of civil actions . . . brought by the Secretary or by a participant, beneficiary, or fiduciary." 29 U.S.C. § 1132(e)(1). Relying on *Giardono v. Jones,* 867 F.2d 409, 411-13 (7th Cir. 1989), the Administrative Defendants argue Sanchez & Daniels and its partners cannot sue under ERISA because they are not plan participants. The Seventh Circuit stated in *Giardono* that an employer could not sue as a participant. *Giardono,* 867 F.2d at 411-12. A little more than a month ago, however (after briefing on the present motions was completed), the Supreme Court abrogated *Giardono,* making clear that employer-partners like Sanchez, Daniels and the other partners of the firm qualify as participants under ERISA. *Yates v. Hendon,* 124 S.Ct. 1330, 1335 (2004).

> If the plan covers one or more employees other than the business owner and his or her spouse, the working owner may participate on equal terms with other plan participants. Such a working owner, in common with other employees, qualifies for the protections ERISA affords plan participants and is governed by the rights and remedies ERISA specifies.

*Id.* The Supreme Court made clear that it was rejecting the position taken by lower courts, including the Seventh Circuit in *Giardono,* "that a business owner may rank only as an

22

'employer' and not also as an 'employee' for purposes of ERISA-sheltered plan participation."
*Id.* Therefore, the partners of Sanchez & Daniels and the similarly-situated employers who are potential class members have standing to sue the Administrative Defendants for breach of fiduciary duty.

In addition to arguing the partners of Sanchez & Daniels cannot sue under ERISA as participants, the Administrative Defendants argue that they cannot sue under ERISA as beneficiaries either because when they withdrew from the Plan they forfeited their status as beneficiaries. We need not consider whether the partners of Sanchez & Daniels have standing to sue under ERISA as beneficiaries because we have found that the partners can sue under ERISA as participants and, therefore, do not need an alternative capacity in which to sue.

U.S. Trust argues that it should be dismissed from Count 2 because Plaintiffs' claims against it are time-barred. Specifically, it argues that Plaintiffs had notice of the alterations made to the Plan documents by U.S. Trust when a copy of the amended documents was sent to Plaintiffs in 1997, and that Plaintiffs had three years from that time to bring a claim for breach of fiduciary duty under ERISA. U.S. Trust Mem. at 3 (citing 29 U.S.C. § 1113). But Plaintiffs' claim against U.S. Trust is based on more than just the amendment of the Plan documents. Plaintiffs also allege that U.S. Trust breached its duty to inform Plaintiffs that contributions to the Plan were not tax deductible, 2d Amended Compl. ¶ 308, and its duty to avoid conflicts of interest. *Id.* ¶ 310. When Plaintiffs learned of these alleged breaches is an issue of fact not appropriate for determination on a motion to dismiss. Therefore, we deny U.S. Trust's motion to dismiss Count 2.

3.    *Count 5*

In Count 5 Plaintiffs allege, as they did in Count 4 of the original complaint, that Murphy, Prudential and the other Insurance Companies violated the Consumer Fraud and Deceptive Business Practices Act. To state a claim under the Act, the plaintiff must allege "(1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Oliveira v. Amoco Oil Co.*, 201 Ill. 2d 134, 149, 776 N.E.2d 151, 160 (2002). Plaintiffs claim that Prudential and Murphy made false and misleading statements in marketing materials regarding the tax and ERISA status of the STEP Plan and that Sanchez & Daniels adopted the Plan in reliance on these misstatements. Plaintiffs allege on behalf of the putative class that the Insurance Companies made the same misstatements in marketing materials relied upon by the class in choosing to invest in the STEP Plan.

Prudential and Murphy sought to dismiss the count when it appeared as Count 4 in the original complaint, arguing that it failed to allege fraud with the specificity required by Rule 9(b). We agreed and dismissed the claim with leave to amend. Plaintiffs did so and renumbered the claim as Count 5. The Insurance Companies – but not Prudential or Murphy – argue that the claim as amended still does not meet the requirements of Rule 9(b). The Court disagrees.

In Count 5, Plaintiffs clearly articulate the who, what, where, when and how of Hartford's alleged commission of fraud. Plaintiffs allege that from August 11 through 19, 1996, Hartford sponsored a booth at a convention at The Sagamore Hotel in upstate New York, where its agents

24

distributed to convention attendees materials marketing contributions to the STEP Plan as tax deductible, even though Hartford knew or should have known that was not true. 2d Amended Compl. ¶¶ 407, 423. Furthermore, Plaintiffs allege that on February 20, 2001, Hartford sent a letter to Plan participant Michael Bearb stating that Plan assets could not be collected by creditors, even though they could be. *Id.* ¶¶ 414-15. Thus Plaintiffs have met the particularity requirements of Rule 9(b) with regard to Hartford.

Plaintiffs allege that the Insurance Companies distributed marketing materials to the employers who had adopted STEP Plans falsely stating that contributions to such Plans were tax deductible. Plaintiffs have attached to their complaint a list prepared by STEP Inc. in 1998 for tax purposes naming the 255 employers who adopted the Plans and the insurance companies whose policies were purchased by those employers. 2d Amended Compl. ¶ 90 (referring to Ex. E of the original complaint). They further allege that the Insurance Companies produced and distributed to each of those employers "plan sponsor binders" that promoted the tax deductible status of contributions to the Plan and stated that the Plan was fully insured even though the Insurance Companies purportedly knew neither statement was true. *Id.* ¶ 432. The locations where the marketing materials were distributed can be assumed to be the places of business of the Plan participants identified on the STEP Plan's tax returns (referred to by Plaintiffs as the Plan's Form 5500 disclosures). Thus Plaintiffs have specified the who, what, where and how of the alleged fraud.

Plaintiffs have not specified exactly when each of these fraudulent misrepresentations occurred, stating only that the statements occurred "during the relevant time period," which Plaintiffs identify in their response brief as 1990 to the present. Pl.'s Resp. to Ins. Cos.' Mot. at

16. Under the present circumstances, this is sufficiently specific to comply with Rule 9(b). Plaintiffs are alleging at least 255 occurrences of fraudulent misrepresentation because there are 255 employers who had adopted STEP Plans by 1998. 2d Amended Compl. ¶ 90. The document attached to the original complaint as exhibit E clearly identifies each of these employers. For that reason, Plaintiffs need not identify the specific dates when these employers were solicited. Their claim is sufficiently particularized to put the Insurance Companies on notice of what constitutes the allegedly fraudulent conduct and when it occurred; the solicitation dates are information presumably within Defendants' own knowledge. The Court therefore denies the Insurance Companies' motion to dismiss Count 5.

4.    *Counts 6 - 8*

In Counts 6 through 8, Plaintiffs allege that all the defendants violated and conspired to violate RICO. These claims were not included in prior versions of the complaint. Specifically, Counts 6 and 7 allege violations of RICO under 18 U.S.C. § 1962(c); Count 8 alleges a conspiracy to violate RICO under § 1962(d). Defendants assert several grounds for dismissal, one of which we can dispose of quickly because we rejected a similar argument made in Defendants' motions to dismiss the original complaint. The Administrative Defendants argue that Plaintiffs' RICO claims are time barred because Plaintiffs knew or should have known of their claims more than four years before the action was filed and thus did not meet RICO's four-year statute of limitations.[7] Specifically, they argue that at the time Plaintiffs adopted the STEP

---

[7] The Court agrees with Plaintiffs that their RICO claims, which arise from the same conduct alleged in the original complaint, relate back to the date the original complaint was filed. *See* Fed. R. Civ. P. 15(c)(2).

26

Plan they had been advised that its tax status was uncertain and, therefore, they had four years from the adoption of the Plan in December 1995 to bring a RICO claim. This argument parallels Defendants' assertion in the previous round of motions to dismiss that Plaintiffs' Consumer Fraud Act claim was time barred.

In rejecting that argument, we noted that "[t]he question of when plaintiffs should have learned of their claims is an issue of fact, properly reserved for a motion for summary judgment." *Daniels*, 2003 WL 22053580, at *5 (citing *Highsmith v. Chrysler Credit Corp.*, 18 F.3d 434, 441-442 (7th Cir. 1994)). We stated that, "[t]hough defendants provide some evidence that the tax status of plaintiffs' STEP Plan was known to be uncertain, that evidence does not demonstrate conclusively that Plaintiffs should have known of their claim prior to February 14, 2000, three years before they filed their suit." *Id.* Defendants' assertion that Plaintiffs' RICO claims are time-barred are rejected for the same reason we rejected Defendants' assertion that Plaintiffs' Consumer Fraud Act claims were time-barred.

Defendants also offer other grounds for dismissing Counts 6 through 8. Essentially they challenge the sufficiency of the pleading as to each element required to state a claim under RICO. To state a claim for a violation of RICO under 18 U.S.C. § 1962(c), Plaintiffs must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985) (footnote omitted). They "must allege sufficient facts to support each element." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998). The Supreme Court has held that to plead sufficiently the conduct element of § 1962(c), "a plaintiff must allege that the defendant 'participated in the operation or management of the enterprise itself,' and that the defendant played 'some part in directing the enterprise's affairs.'" *Id.* (quoting *Reves v. Ernst*

& *Young*, 507 U.S. 170, 179 (1993)). "In short, mere participation in the activities of the enterprise is insufficient; the defendant must participate in the operation or management of the enterprise." *Id.* That means that "simply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability under § 1962(c)." *Id.* at 728 (citing *Emery v. American Gen. Fin., Inc.*, 134 F.3d 1321, 1325 (7th Cir. 1998)).

In hopes of satisfying the enterprise element, Plaintiffs assert two theories of what constitutes the criminal enterprise for purposes of their RICO claims. In Count 6, Plaintiffs allege that the STEP Plan is an enterprise for purposes of RICO; in Count 7, they allege that Defendants constitute an association-in-fact enterprise. These track the two types of associations recognized as enterprises in § 1961(4). "The first encompasses organizations such as corporations and partnerships, and other 'legal entities.' The second covers 'any union or group of individuals associated in fact although not a legal entity.'" *U.S. v. Turkette*, 452 U.S. 575, 581-82 (1981).

Whichever category an association falls into, it is not a RICO enterprise unless it has "an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision making." *Stachon v. United Consumers Club, Inc.*, 229 F.3d 673, 675 (7th Cir. 2000) (citing *Jennings v. Emry*, 910 F.2d 1434, 1440 (7th Cir. 1990); internal quotation marks omitted). A plaintiff need not plead "much structure, but the enterprise must have some continuity and some differentiation of the roles within it." *Richmond v. Nationwide Cassel*, 52 F.3d 640, 645 (7th Cir. 1995) (citing *Burdette v. Miller*, 957 F.2d 1375, 1379 (7th Cir. 1992)). In addition, a plaintiff cannot adequately allege an enterprise by asserting

what the association does rather than what it is. *Stachon*, 229 F.3d at 676 (citing *Jennings*, 910 F.2d at 1440). In other words, a pattern of racketeering activity does not itself reflect the existence of an enterprise. *Turkette*, 452 U.S. at 583. "[B]ecause a RICO enterprise is more than a group of people who get together to commit a pattern of racketeering activity, there must be an organization with a structure and goals separate from the predicate acts themselves." *Stachon*, 229 F.3d at 675 (internal quotation marks and citations omitted). Thus to survive Defendants' motions to dismiss, Plaintiffs must allege more than just a scheme or conspiracy to defraud consumers, "otherwise, 'every conspiracy to commit fraud that requires more than one person to commit is a RICO organization and consequently every fraud that requires more than one person to commit is a RICO violation.'" *Id.* at 676 (quoting *Bachman v. Bears, Stearns & Co.*, 178 F.3d 930, 932 (7th Cir. 1999)).

To satisfy the pattern requirement, a plaintiff must "plead sufficient facts to show that the [defendants] engaged in a pattern of racketeering activity," which "consists, at a minimum, of two predicate acts of racketeering (committed within a ten-year time period)." *Slaney*, 244 F.3d at 598-99 (citing *Goren*, 156 F.3d at 728). The plaintiff must allege that "'the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 779 (7th Cir. 1994) (emphasis original) (quoting *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

The Supreme Court has recognized two types of continuity: closed- and open-ended. "In order to demonstrate a pattern over a closed period, a RICO plaintiff must 'prov[e] a series of related predicates extending over a substantial period of time.'" *Vicom*, 20 F.3d at 779 (quoting *H.J., Inc.*, 492 U.S. at 242). Factors relevant to this durational measure are "'the number and

29

variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries.'" *Id.* at 780 (quoting *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986)). The Seventh Circuit has said that "a time frame of less than nine months likely does not satisfy the duration requirement." *Id.* As for the number of predicate acts, the Seventh Circuit has said that multiple acts of mail or wire fraud do not necessarily form a pattern because "[m]ail and wire fraud are perhaps unique among the various sorts of 'racketeering activity' possible under RICO in that the existence of a multiplicity of predicate acts . . . may be no indication of the requisite continuity of the underlying fraudulent activity.'" *Id.* at 781 (quoting *Lipin Enterprises, Inc. v. Lee*, 803 F.2d 322, 325 (7th Cir. 1986) (Cudahy, J., concurring)).

Alternatively, the Supreme Court has held that "open-ended continuity may satisfy the continuity prong of the pattern requirement regardless of its brevity." *Id.* at 782 (citing *H.J., Inc.*, 492 U.S. at 242). To allege open-ended continuity, a plaintiff must assert that "(1) 'a specific threat of repetition' exists, (2) 'the predicates are a regular way of conducting [an] ongoing legitimate business,' or (3) 'the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purpose.'" *Id.* (citing *H.J., Inc.*, 492 U.S. at 242-43). If the alleged conduct focused on one goal, a plaintiff usually cannot allege open-ended continuity. *Id.* at 783 (citation omitted). And "bald assertions" of continued activity, such as "James Elliot continues his racketeering activities," do not properly allege a theat of continuity. *Id.* However, a plaintiff need not allege a specific threat of continuity if she can assert that "'the predicate acts are a regular way of conducting [the] defendant's ongoing legitimate business.'" *Id.* (quoting *H.J., Inc.*, 492 U.S. at 243). Under this showing of open-ended continuity, Plaintiffs

30

would have to allege that mail and wire fraud or embezzlement are routinely employed by Defendants in the conduct of their businesses.

To satisfy the final element, racketeering activity, Plaintiffs must allege that Defendants committed acts violating one or more of the statutes listed in § 1961(1). Plaintiffs allege that Defendants engaged in mail and wire fraud and embezzlement. Allegations of mail or wire fraud – even when asserted as predicate acts and not stand-alone offenses – must be pled with particularity in compliance with Fed. R. Civ. P. 9(b). *Slaney*, 244 F.3d at 599. That means a plaintiff must "allege 'the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Goren*, 156 F.3d at 729 (quoting *Vicom*, 20 F.3d at 777). In a multiple defendant case such as this, a plaintiff must "plead sufficient facts to notify each defendant of his alleged participation in the scheme." *Id.* at 726 (citing *Vicom*, 20 F.3d at 778). Rule 9(b) does not apply to Plaintiffs' claims that Defendants engaged in embezzlement.

In addition, "to state a viable claim for conspiracy under § 1962(d), a plaintiff must allege that (1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Slaney*, 244 F.3d at 600 (citing *Lachmund v. ADM Investor Services, Inc.*, 191 F.3d 777, 784 (7th Cir. 1999)). This means the conduct and pattern elements for a RICO conspiracy claim are less stringent than for a claim under RICO's substantive prohibitions. For example, a plaintiff alleging a RICO conspiracy need not plead that defendants agreed "to commit personally two predicate acts of racketeering" or that they can be "characterized as an operator or manager of a

RICO enterprise under *Reves v. Ernst & Young*, 507 U.S. 170 (1993)." *Goren*, 156 F.3d at 731 (citations omitted). However, the Seventh Circuit has cautioned "that the broad construction of the RICO conspiracy provision should not be used by the courts 'to criminalize mere association with an enterprise.'" *Id.* at 731-32 (citing *United States v. Neapolitan*, 791 F.2d 489, 498 (7th Cir. 1986)). Thus "in order to plead a viable § 1962(d) claim," a plaintiff must allege that the defendants "'agreed to the objective of a violation of RICO.'" *Id.* at 732 (citing *Neapolitan*, 791 F.2d at 498).

Now that we have set forth the relevant law, the Court will address Defendants' contentions. Defendants argue that Counts 6 and 7 do not sufficiently allege the conduct and enterprise elements necessary to state a claim under RICO. Specifically, the Insurance Companies, Prudential and Murphy contend that Plaintiffs have not alleged adequately that they operated a criminal enterprise, which Plaintiffs identify in Count 6 as being the STEP Plan and in Count 7 as a conglomeration of the Defendants. All Defendants argue that Plaintiffs have failed to allege an association-in-fact enterprise in Count 7. The STEP Plan is a legal entity and, as the Plan documents quoted above indicate, the Plan has an ongoing structure that is organized to facilitate decision making by designated actors within a management hierarchy. Therefore, it qualifies as an enterprise for purposes of RICO. However, Plaintiffs have failed to allege how Defendants as a group constitute an association in fact. Plaintiffs do not allege that Defendants have formed a relationship with an ongoing structure conducive to hierarchical or consensual decision making, as required by *Stachon* to plead an association-in-fact enterprise for purposes of RICO. Instead, Plaintiffs allege that Defendants all participated in a scheme to defraud Plaintiffs. But the Seventh Circuit has made clear that a plaintiff cannot allege an enterprise by asserting

32

what the association does rather than what it is. *Stachon*, 229 F.3d at 676 (citing *Jennings*, 910 F.2d at 1440). Thus, Count 7 fails to state a claim.

However, because the STEP Plan qualifies as an enterprise, we must consider whether in Count 6 Plaintiffs have adequately pled the other three elements necessary to state a claim for a RICO violation. Our discussion above about who were Plan fiduciaries – that is, who had discretionary authority to manage the STEP Plan – is informative in determining whether Plaintiffs have sufficiently alleged the "conduct" aspect of a RICO claim. Plaintiffs have failed to allege that the Insurance Companies, Prudential or Murphy "conducted or participated in the conduct of the *'enterprise's* affairs,' not just their *own* affairs.'" *Richmond*, 52 F.3d at 646 (citation and internal quotation marks omitted; emphasis in original). They have not alleged that the Insurance Companies, Prudential or Murphy participated in the operation or management of the STEP Plan, as required under *Goren* to meet the conduct element. In fact, the Plan documents make clear that the insurers' participation in Plan management was limited to administrative functions with respect to the insurance policies. Compl. Ex. A § 9.12. Performance of such services for the STEP Plan — even if the Insurance Companies knew the Plan was engaged in wrongdoing — is not enough to characterize their involvement with the Plan as "conduct" of an enterprise under RICO. *Goren*, 156 F.3d at 728. However, as discussed above the Administrative Defendants and U.S. Trust were responsible for managing the Plan – they served as the Plan sponsors, trustees, and administrators. Thus Plaintiffs have satisfied the conduct element with regards to the Administrative Defendants and U.S. Trust but not the Insurance Companies, Prudential or Murphy, who are for this reason dismissed from Count 6.

We next must consider whether Plaintiffs have sufficiently alleged the pattern and

33

racketeering elements as to the Administrative Defendants and U.S. Trust. Defendants' challenges to Count 6 crescendo with their claim that Plaintiffs have failed adequately to allege predicate criminal acts because the allegations of mail and wire fraud do not meet the particularity requirements of Rule 9(b). "[A]llegations of fraud in a civil RICO complaint are subject to the heightened pleading standard of Fed. R. Civ. P. 9(b), which requires a plaintiff to plead all averments of fraud with particularity." *Slaney*, 244 F.3d at 597 (citing *Goren*, 156 F.3d at 726). But before considering whether the allegations of fraud are pled with particularity, we will consider Defendants' contention that the communications complained of were not fraudulent.

Of the ten allegations of mail fraud made by Plaintiffs, only three (2d Amended Compl. ¶¶ 460 (a)(3), (b)(4) and (b)(5)) actually allege fraud – the others do not allege a knowing misrepresentation. Two of those allegations (¶¶ 460(b)(4) & (b)(5)) involve alleged fraud by Hartford. We have dismissed Hartford from the RICO claims, and its conduct cannot serve as the basis for RICO claims against the Administrative Defendants or U.S. Trust, who are not alleged to have participated in Hartford's purported fraud. Plaintiffs' only allegation of wire fraud, an allegation that the Benistar Entities misrepresented the outcome of a case in an e-mail, does allege fraud involving the Administrative Defendants. Thus Plaintiffs have only alleged two pertinent incidents of wire or mail fraud.

These two alleged incidents of fraud can constitute predicate acts only if they have been pled with particularity, meaning Plaintiffs must allege the who, what, when, where and how of the fraud. In the allegation of mail fraud, Plaintiffs allege that on September 30, 2003 the Benistar Entities sent a letter to Jack Robinson misrepresenting the outcome of a lawsuit

involving the Benistar Entities. 2d Amended Compl. ¶ 460(a)(3). In the allegation of wire fraud, Plaintiffs allege that on September 29, 2003, the Benistar Entities sent an e-mail to all participating employers repeating the misrepresentation made to Robinson. *Id.* ¶ 460(f)(1). Both allegations comply with Rule 9(b).

The Seventh Circuit has stated, however, that two acts of mail or wire fraud may not be enough to establish the pattern needed to state a claim under RICO. *See Vicom*, 20 F.3d at 781. Significantly, the two acts are based on a single misstatement made twice over a two day period. The only substantial differences between the acts is the method of communication — i.e., one via e-mail and the other via mail — and the number of people reached. The propagation of one alleged lie through multiple channels of communication over a two day period certainly does not constitute a pattern under either the closed-ended or open-ended theories of continuity. In short, Plaintiffs have failed to allege closed-ended continuity because they are essentially complaining only of one act; they have failed to allege open-ended continuity because this single example of a broadly distributed misrepresentation does not suggest this is a regular way the Administrative Defendants conduct the business of the STEP Plan.

A pattern of racketeering activity exists, however, when Plaintiffs' claims of embezzlement are thrown into the mix. Rule 9(b) does not apply to allegations of embezzlement, as they do not involve "averments of fraud" within the meaning of Rule 9(b). "Embezzlement occurs when a person who has lawfully received funds willfully diverts them to his own unauthorized use." *Associates in Adolescent Psychiatry v. Home Life Insurance Co*, 941 F.2d 561, 570 (7th Cir. 1991) (citing *United States v. Marquardt*, 786 F.2d 771, 780 (7th Cir. 1986)). Plaintiffs allege seven incidents of embezzlement by the Administrative Defendants. The alleged

incidents, taken collectively, paint a picture of the Administrative Defendants abusing their fiduciary duties by using Plan assets for their own advantage, denying Plaintiffs benefits so that the Administrative Defendants could continue making money off of the funds, siphoning Plan assets for their own use, and using Plan funds to perpetrate a ruse to induce Plaintiffs to continue participating in the Plan and thus continue generating fees for the Administrative Defendants. 2d Amended Compl. ¶ 459. This satisfies both closed-ended and open-ended continuity in that it describes multiple events over a lengthy period of time to the injury of many victims and suggests it is a way the Administrative Defendants have done business and will continue to do business in connection with the STEP Plan.

The Administrative Defendants argue that Plaintiffs have not alleged two acts of racketeering by Teplitzky or Mellon. We agree as to Mellon but not Teplitzky. One of Plaintiffs' allegations is that STEP Plan funds were used to pay for a Plan participant's litigation regarding the tax status of contributions the participant made to the Plan. *Id.* ¶ 459(b). Although Teplitzky is not specifically named in ¶ 459(b), Plaintiffs state in ¶ 278 that Teplitzky may have been the one to approve the expenditure. The second allegation involving Teplitzky is that he willfully retained the Prudential demutualization proceeds that should have been added to the Plan assets. *Id.* ¶ 459(c). In contrast, Plaintiffs make only one allegation regarding Mellon. Plaintiffs allege that Mellon failed to notify employers when termination events occurred, preventing the payout of benefits and enabling Defendants to continue deriving benefits from funds that should have been paid out to the participants. *Id.* ¶ 459(e). We will not assume that simply by virtue of being the Plan trustee, Mellon was involved in all the acts of embezzlement alleged to have been committed by the Administrative Defendants. Mellon is therefore

dismissed from Count 6, because Plaintiffs have not alleged it engaged in two predicate acts. We otherwise deny the Administrative Defendants' motion to dismiss Count 6. Plaintiffs also have failed to allege that U.S. Trust engaged in two predicate acts, and thus its motion to dismiss is granted.

Because we have already determined that Plaintiffs failed to allege an association-in-fact enterprise in Count 7, there remains only to determine whether Plaintiffs can proceed on Count 8. The Insurance Companies argue that Count 8 must be dismissed because the Seventh Circuit has held that a claim under § 1962(d) must be dismissed if based on the same facts as a claim under § 1962(c) that has been dismissed by the court. *Stachon*, 229 F.3d at 677 (citing *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1026 (7th Cir. 1992)). We agree that Count 8 must be dismissed as to the Insurance Companies, Prudential, Murphy and U.S. Trust on those grounds. In contrast, the Administrative Defendants' Motion to Dismiss Count 8 must be denied because Plaintiffs have alleged that the Administrative Defendants agreed "to participate in the affairs of an enterprise through a pattern of racketeering activity" already discussed and that they agreed at least two predicate acts would be committed to accomplish these goals. *Slaney*, 244 F.3d at 600.

Although we have dismissed Mellon from Count 6, we do not dismiss it from Count 8. To state a claim of RICO conspiracy, Plaintiffs need only plead that Defendants agreed that someone would engage in two predicate acts – it is not necessary that each Defendant agreed that it would commit two predicate acts on its own.

## Conclusion

Plaintiffs' motion to alter, amend, or clarify the order of March 18, 2004 [docket # 183] is

37

granted as to Count 2 but is otherwise denied. The Court's memorandum opinion and order of March 18, 2004 is vacated, and this amended memorandum opinion and order is issued in its place.

For the reasons stated above, the Court grants Prudential's Motion to Dismiss [docket # 124] except as to Count 2. The Court grants Murphy's Motion to Dismiss [docket # 122] in its entirety. The Court grants the Insurance Companies' Motion to Dismiss [docket # 121] as to Counts 1, 4, 6, 7, and 8 but denies it as to Counts 2 and 5. The Court grants the Administrative Defendants' Motion to Dismiss and Strike the Second Amended Complaint [docket # 123-1, 2] as to Counts 1 and 7, denies the motion as to Counts 2, 3, and 8, and denies in part and grants in part the motion as to Count 6 (see above). The Court grants U.S. Trust's Motion to Dismiss [docket # 161] as to Counts 1, 6, 7, and 8 but denies it as to Count 2. Metropolitan Life is directed to file a reply brief in support of its pending motion for summary judgment within ten days of this order.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: April 14, 2004